## VICTORY CARRIERS, INC., ET AL. v. LAW

No. 70–54.  Argued October 18–19, 1971—
Decided December 13, 1971

*W. Boyd Reeves* argued the cause for petitioners. With him on the briefs were *George F. Wood* and *T. K. Jackson, Jr.*

*Ross Diamond, Jr.,* argued the cause for respondent. With him on the brief was *J. Cecil Gardner.*

*E. D. Vickery, Dennis Lindsay, Francis A. Scanlan,* and *J. Stewart Harrison* filed a brief for the National Maritime Compensation Committee as *amicus curiae* urging reversal.

*David B. Kaplan* filed a brief for the American Trial Lawyers Association as *amicus curiae* urging affirmance.

MR. JUSTICE WHITE delivered the opinion of the Court.

The question presented here is whether state law or federal maritime law governs the suit of a longshoreman

injured on a pier while driving a forklift truck which was moving cargo that would ultimately be loaded aboard ship.

The facts are undisputed. When the accident happened, respondent Bill Law, a longshoreman employed by Gulf Stevedore Corp. in Mobile, Alabama, was on the pier driving a forklift loaded with cargo destined for the S. S. *Sagamore Hill,* a vessel owned by petitioner Victory Carriers, Inc., which was tied up at the pier. Law had picked up the load on the dock and was transferring it to a point alongside the vessel where it was to be subsequently hoisted aboard by the ship's own gear. The forklift was owned and under the direction of his stevedore employer. As Law returned toward the pickup point, the overhead protection rack of the forklift came loose and fell on him. He subsequently brought an action in a federal District Court against the ship and Victory Carriers, Inc., claiming that the unseaworthiness of the vessel and the negligence of Victory had caused his injuries. His claim invoked both the diversity jurisdiction of the District Court under 28 U. S. C. § 1332 and its admiralty and maritime jurisdiction under 28 U. S. C. § 1333. Victory filed a third-party complaint against Gulf for indemnity in the event Victory was held liable to Law. The unseaworthiness claim became the critical issue.[1] On cross motions for summary judgment, the District Court gave judgment for petitioners on the ground that Law was not engaged in loading the vessel and that the doctrine of unseaworthiness did not extend to him. The Court of Appeals reversed. Relying on *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946), and *Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S. 206

---

[1] The District Court and the Court of Appeals dealt only with the unseaworthiness claim; the District Court did not pass on the question of whether or not the forklift was in fact defective. 432 F. 2d 376, 378 n. 2 (CA5 1970).

(1963), it held that the fundamental question was whether Law at the time was engaged in loading the *Sagamore Hill* and that since he was so engaged, he should be entitled to prove his allegations of unseaworthiness at a trial. We granted certiorari and now reverse the judgment of the Court of Appeals.

Article III, § 2, cl. 1, of the Constitution of the United States extends the federal judicial power "to all Cases of admiralty and maritime Jurisdiction." Congress has implemented that provision by 28 U. S. C. § 1333 which now provides that the district courts shall "have original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." Under the saving-to-suitors clause of § 1333, the plaintiff was entitled to assert his claims under the diversity jurisdiction of the District Court, as well as under § 1333 itself, cf. *Pope & Talbot, Inc.* v. *Hawn,* 346 U. S. 406, 410–411 (1953), but under either section the claim that a ship or its gear was unseaworthy would be rooted in federal maritime law, not the law of the State of Alabama. *Id.,* at 409. Whether federal maritime law governed this accident in turn depends on whether this is a case within the admiralty and maritime jurisdiction conferred on the district courts by the Constitution and the jurisdictional statutes. More precisely, the threshold issue is whether maritime law governs accidents suffered by a longshoreman who is injured on the dock by allegedly defective equipment owned and operated by his stevedore employer. We hold that under the controlling precedents, federal maritime law does not govern this accident. Nor, in the absence of congressional guidance, are we now inclined to depart from prior law and extend the reach of the federal law to pier-side accidents caused by a stevedore's pier-based equipment.

The historic view of this Court has been that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident and that maritime law governs only those torts occurring on the navigable waters of the United States. Maritime contracts are differently viewed, but as Mr. Justice Story remarked long ago:

"In regard to torts I have always understood, that the jurisdiction of the admiralty is exclusively dependent upon the locality of the act. The admiralty has not, and never (I believe) deliberately claimed to have any jurisdiction over torts, except such as are maritime torts, that is, such as are committed on the high seas, or on waters within the ebb and flow of the tide." *Thomas* v. *Lane*, 23 F. Cas. 957, 960 (No. 13,902) (CC Me. 1813).

The view has been constantly reiterated.[2]

"The general doctrine that in contract matters admiralty jurisdiction depends upon the nature of the

---

[2] *Waring* v. *Clarke*, 5 How. 441, 463–464 (1847); *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344, 394 (1848); *The Propeller Commerce*, 1 Black 574, 579 (1862); *The Plymouth*, 3 Wall. 20, 33 (1866); *The Rock Island Bridge*, 6 Wall. 213, 215 (1867); *The Belfast*, 7 Wall. 624, 637 (1869); *Ex parte Easton*, 95 U. S. 68, 72 (1877); *Leathers* v. *Blessing*, 105 U. S. 626, 630 (1882); *Ex parte Phenix Insurance Co.*, 118 U. S. 610, 618 (1886); *Johnson* v. *Chicago & Pacific Elevator Co.*, 119 U. S. 388, 397 (1886); *Panama R. Co.* v. *Napier Shipping Co.*, 166 U. S. 280, 285 (1897); *The Blackheath*, 195 U. S. 361, 367 (1904); *Cleveland Terminal & Valley R. Co.* v. *Cleveland S. S. Co.*, 208 U. S. 316, 319 (1908); *Martin* v. *West*, 222 U. S. 191, 197 (1911); *Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52, 59–60 (1914); *Grant Smith-Porter Ship Co.* v. *Rohde*, 257 U. S. 469, 476 (1922); *T. Smith & Son* v. *Taylor*, 276 U. S. 179, 181 (1928); *O'Donnell* v. *Great Lakes Dredge & Dock Co.*, 318 U. S. 36, 41 (1943); *Pope & Talbot, Inc.* v. *Hawn*, 346 U. S. 406, 409 (1953); *Kermarec* v. *Compagnie Generale Transatlantique*, 358 U. S. 625, 628 (1959); *Hess* v. *United States*, 361 U. S. 314, 318 n. 7 (1960); *Rodrigue* v. *Aetna Casualty & Surety Co.*, 395 U. S. 352, 360–361 (1969);

transaction and in tort matters upon the locality, has been so frequently asserted by this court that it must now be treated as settled." *Grant Smith-Porter Ship Co.* v. *Rohde,* 257 U. S. 469, 476 (1922).

The maritime law was thought to reach "[e]very species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters . . . ." *Atlantic Transport Co.* v. *Imbrovek,* 234 U. S. 52, 60 (1914). But, accidents on land were not within the maritime jurisdiction as historically construed by this Court.[3] Piers and docks were consistently deemed

*Nacirema Operating Co.* v. *Johnson,* 396 U. S. 212, 214–215 (1969); *Thomas* v. *Lane,* 23 F. Cas. 957, 960 (No. 13,902) (CC Me. 1813) (Story, J.); *De Lovio* v. *Boit,* 7 F. Cas. 418, 420 (No. 3,776) (CC Mass. 1815) (Story, J.); *Lake Shore & M. S. R. Co.* v. *The Neil Cochran,* 14 F. Cas. 949, 950 (No. 7,996) (ND Ohio 1872); *The Ottawa,* 18 F. Cas. 906, 907 (No. 10,616) (ED Mich. 1872); *Holmes* v. *O. & C. R. Co.,* 5 F. 75, 77 (Ore. 1880); *The Arkansas,* 17 F. 383, 384 (SD Iowa 1883); *The F. & P. M. No. 2,* 33 F. 511, 513 (ED Wis. 1888); *The H. S. Pickands,* 42 F. 239, 240 (ED Mich. 1890); *Hermann* v. *Port Blakely Mill Co.,* 69 F. 646, 647 (ND Cal. 1895); *The Strabo,* 90 F. 110, 113 (EDNY 1898); *Chapman* v. *City of Grosse Pointe Farms,* 385 F. 2d 962, 963 (CA6 1967); *Scott* v. *Eastern Air Lines, Inc.,* 399 F. 2d 14, 31 (CA3 1967) (concurring opinion); *Fireman's Fund American Insurance Co.* v. *Boston Harbor Marina, Inc.,* 406 F. 2d 917, 919 (CA1 1969); *Penn Tanker Co.* v. *United States,* 409 F. 2d 514, 518 (CA5 1969). "The jurisdiction of courts of admiralty, in matters of contract, depends upon the nature and character of the contract; but in torts, it depends entirely on locality." *Philadelphia, Wilmington, & Baltimore R. Co.* v. *Philadelphia & Havre de Grace Steam Towboat Co.,* 23 How. 209, 215 (1860). "In [maritime] torts . . . jurisdiction [of federal admiralty courts] depends solely upon the place where the tort was committed, which must have been upon the high seas or other navigable waters." *State Industrial Comm'n* v. *Nordenholt Corp.,* 259 U. S. 263, 271 (1922).

[3] *The Plymouth, supra; The Troy,* 208 U. S. 321 (1908); *Phoenix Construction Co.* v. *The Steamer Poughkeepsie,* 212 U. S. 558 (1908); *T. Smith & Son* v. *Taylor, supra; Rodrigue* v. *Aetna Casualty & Surety Co., supra,* at 360; *Hastings* v. *Mann,* 340 F. 2d 910 (CA4),

extensions of land;[4] injuries inflicted to or on them were held not compensable under the maritime law. *The Plymouth*, 3 Wall. 20, 36 (1866); *Ex parte Phenix Insurance Co.*, 118 U. S. 610, 618–619 (1886); *Johnson v. Chicago & Pacific Elevator Co.*, 119 U. S. 388, 397 (1886); *Cleveland Terminal & Valley R. Co. v. Cleveland S. S. Co.*, 208 U. S. 316, 320 (1908). The gangplank has served as a rough dividing line between the state and maritime regimes.

In defense of this boundary and the exclusive jurisdiction of the maritime law, the Court twice rejected congressional efforts to apply state workmen's compensation statutes to shipboard injuries suffered by maritime workers and longshoremen.[5] Accepting these decisions, Congress passed the Longshoremen's and Harbor Work-

---

cert. denied, 380 U. S. 963 (1965). "When an employee, working on board a vessel in navigable waters, sustains personal injuries there, and seeks damages from the employer, the applicable legal principles are very different from those which would control if he had been injured on land while unloading the vessel. In the former situation the liability of employer [sic] must be determined under the maritime law; in the latter, no general maritime rule prescribes the liability, and the local law has always been applied." *State Industrial Comm'n v. Nordenholt Corp.*, supra, at 272–273.

[4] *Nacirema Operating Co. v. Johnson*, supra, at 214–215; *Swanson v. Marra Bros., Inc.*, 328 U. S. 1, 6 (1946); *Minnie v. Port Huron Terminal Co.*, 295 U. S. 647, 648 (1935); *T. Smith & Son v. Taylor*, supra, at 182; *State Industrial Comm'n v. Nordenholt Corp.*, supra, at 275; 1 E. Benedict, The Law of American Admiralty §§ 28, 29 (6th ed. 1940); G. Gilmore & C. Black, The Law of Admiralty §§ 6–46, 7–17 (1957); G. Robinson, Handbook of Admiralty Law in the United States § 11 (1939).

[5] *Knickerbocker Ice Co. v. Stewart*, 253 U. S. 149 (1920); *Washington v. W. C. Dawson & Co.*, 264 U. S. 219 (1924). These congressional attempts were sparked by an earlier Supreme Court decision, *Southern Pacific Co. v. Jensen*, 244 U. S. 205 (1917), which had held unconstitutional a New York workmen's compensation law as applied to a stevedore injured on the gangplank of a ship.

ers' Compensation Act[6] in 1927, providing a system of compensation for longshoremen injured on navigable waters but anticipating that dockside accidents would remain under the umbrella of state law and state workmen's compensation systems. *Nacirema Operating Co.* v. *Johnson,* 396 U. S. 212, 217–219 (1969); *South Chicago Coal & Dock Co.* v. *Bassett,* 309 U. S. 251, 256–257 (1940). The relative roles of state and federal law nevertheless remained somewhat confused on the seaward side of the pier.[7] But shoreward, absent legislation, the line held

---

[6] 44 Stat. 1424, 33 U. S. C. §§ 901–950. The Act's coverage is limited to those injuries and deaths "occurring upon the navigable waters of the United States (including any dry dock)." 33 U. S. C. § 903 (a).

[7] This confusion may be traced to the Court's modifying the doctrine of *Southern Pacific Co.* v. *Jensen, supra,* by preserving certain state remedies for accidents and deaths occurring on navigable waters. See *Western Fuel Co.* v. *Garcia,* 257 U. S. 233 (1921); *Grant Smith-Porter Ship Co.* v. *Rohde, supra; Parker* v. *Motor Boat Sales, Inc.,* 314 U. S. 244 (1941); *Davis* v. *Dept. of Labor and Industries,* 317 U. S. 249 (1942); *Calbeck* v. *Travelers Insurance Co.,* 370 U. S. 114 (1962). All of these cases of overlapping state-federal jurisdiction have occurred on the seaward side of the *Jensen* line, however. The Court early upheld the power of States to provide workmen's compensation to longshoremen injured by accidents occurring on the dock, under the theory that since the pier is part of the land, application of state law here would not conflict with the uniform federal maritime law applied on navigable waters. *State Industrial Comm'n* v. *Nordenholt Corp., supra.* In *Nacirema Operating Co.* v. *Johnson, supra,* the Court held that by limiting coverage under § 3 (a) of the Act, 33 U. S. C. § 903 (a), to accidents occurring "upon . . . navigable waters," Congress had not intended to cover accidents that occurred on piers permanently affixed to the shore: "*Calbeck* made it clear that Congress intended to exercise its full jurisdiction seaward of the *Jensen* line and to cover all injuries on navigable waters, whether or not state compensation was also available in particular situations. . . . But removing uncertainties as to the Act's coverage of injuries occurring on navigable waters is a far cry from construing the Act to reach injuries on land traditionally within the ambit of state compensation acts." 396 U. S., at 220–221.

fast. The Court refused to permit recovery in admiralty even where a ship or its gear, through collision or otherwise, caused damage to persons ashore or to bridges, docks, or other shore-based property. *The Plymouth, supra; Cleveland Terminal & Valley R. Co.* v. *Cleveland S. S. Co., supra; The Troy,* 208 U. S. 321 (1908); *Martin* v. *West,* 222 U. S. 191 (1911).

Congress was dissatisfied with these decisions and passed the Admiralty Extension Act of 1948 specifically to overrule or circumvent this line of cases.[8] The law as enacted provided that "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 62 Stat. 496, 46 U. S. C. § 740. The statute survived constitutional attack in the lower federal courts [9] and was applied without question by this

---

[8] 62 Stat. 496, 46 U. S. C. § 740. The House Report on the Admiralty Extension Act stated that the Act was being passed to remedy the "inequities" of cases such as *Cleveland Terminal & Valley R. Co., supra; The Troy, supra;* and *Martin* v. *West, supra,* which had held there was no admiralty jurisdiction to provide a remedy for damage done by ships on navigable water to land structures. H. R. Rep. No. 1523, 80th Cong., 2d Sess., 2 (1948). Congress had also passed the Jones Act, 41 Stat. 1007, 46 U. S. C. § 688, providing a statutory remedy for members of a ship's crew injured in the course of their employment. The Act covered crewmen injured ashore as well as aboard and was considered by this Court an extension of the ancient remedy of maintenance and cure which itself was a traditional and important exception to the usual rule that maritime law does not provide remedies for injuries on land. *O'Donnell* v. *Great Lakes Dredge & Dock Co., supra.* Longshoremen, of course, are not covered by the Jones Act.

[9] *United States* v. *Matson Nav. Co.,* 201 F. 2d 610, 614–616 (CA9 1953); *American Bridge Co.* v. *The Gloria O,* 98 F. Supp. 71, 73–74 (EDNY 1951); *Fematt* v. *City of Los Angeles,* 196 F. Supp. 89, 93 (SD Cal. 1961).

210

Court in *Gutierrez, supra,* to provide compensation for a longshoreman injured on a dock by defective cargo containers being unloaded from a ship located on navigable waters. No case in this Court has sustained the application of maritime law to the kind of accident that occurred in this case. *State Industrial Comm'n v. Nordenholt Corp.,* 259 U. S. 263 (1922), has not been overruled. There, the Court held that compensation for a longshoreman injured when he slipped on a dock while stacking bags of cement that had been unloaded from a ship was governed by local law, not federal maritime law.

It is argued, however, that if a longshoreman may recover for unseaworthiness if injured on a ship in the course of the unloading process, *Seas Shipping Co.* v. *Sieracki, supra,* and if he has an unseaworthiness claim for injuries sustained on the pier and caused by the ship's unloading gear, *Gutierrez, supra,* he is also entitled to sue in admiralty when he is injured on the dock by his own employer's equipment at the time he is engaged in the service of a ship located on navigable waters. *Sieracki, supra,* however, did not call into question the extent of federal admiralty and maritime jurisdiction since the accident there occurred on navigable waters.[10] And in *Gutierrez, supra,* federal admiralty jurisdiction was clearly present since the Admiralty Extension Act on its face reached the injury there involved. The decision in *Gutierrez* turned, not on the "function" the stevedore was performing at the time of his injury, but, rather, upon the fact that his

---

[10] In *Sieracki,* the Court concluded:

"[F]or injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes he is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards." 328 U. S., at 99 (footnote omitted).

injury was caused by an appurtenance of a ship, the defective cargo containers, which the Court held to be an "injury, to person . . . caused by a vessel on navigable water" which was consummated ashore under 46 U. S. C. § 740. The Court has never approved an unseaworthiness recovery for an injury sustained on land merely because the injured longshoreman was engaged in the process of "loading" or "unloading." [11] *Nacirema Operating Co.* v. *Johnson,* 396 U. S., at 223, a case decided several years after *Gutierrez,* makes this quite clear:

> "There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. But even construing the Extension Act to amend the Longshoremen's Act would not effect this result, since longshoremen injured on a pier by pier-based equipment would still remain outside the Act."

See also *Rodrigue* v. *Aetna Casualty & Surety Co.,* 395 U. S. 352, 360 (1969).

We are not inclined at this juncture to disturb the existing precedents and to extend shoreward the reach of the maritime law further than Congress has approved. We are dealing here with the intersection of federal and

---

[11] In *Gutierrez,* the Court concluded that *"things about a ship,* whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." 373 U. S., at 213 (emphasis added). In *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396 (1954), aff'g 205 F. 2d 478 (CA9 1953), and *Rogers* v. *United States Lines,* 347 U. S. 984 (1954), rev'g 205 F. 2d 57 (CA3 1954), the Court decided without opinion that an unseaworthiness recovery would be possible to a longshoreman injured by equipment brought aboard ship by the stevedore company. In both these cases, the accident occurred on navigable water: both longshoremen were injured while in the hold of a ship by defective apparatus attached to the ship's gear.

state law. As the law now stands, state law has traditionally governed accidents like this one. To afford respondent a maritime cause of action would thus intrude on an area that has heretofore been reserved for state law, would raise difficult questions concerning the extent to which state law would be displaced or pre-empted, and would furnish opportunity for circumventing state workmen's compensation statutes. In these circumstances, we should proceed with caution in construing constitutional and statutory provisions dealing with the jurisdiction of the federal courts. As the Court declared in *Healy* v. *Ratta,* 292 U. S. 263, 270 (1934), "The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts may be restricted only by the action of Congress in conformity to the judiciary sections of the Constitution. . . . Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which [a federal] statute has defined." See also *Romero* v. *Int'l Terminal Operating Co.,* 358 U. S. 354, 379–380, and 408 (BRENNAN, J., dissenting and concurring) (1959).

That longshoremen injured on the pier in the course of loading or unloading a vessel are legally distinguished from longshoremen performing similar services on the ship is neither a recent development nor particularly paradoxical. The maritime law is honeycombed with differing treatment for seamen and longshoremen, on and off the ship,[12] and affirmance of the Court of Appeals

---

[12] The Longshoremen's and Harbor Workers' Compensation Act does not cover seamen (who are defined there as "master[s] or member[s] of a crew of any vessel," 33 U. S. C. § 903 (a)(1)), and the compensation remedy provided by the Longshoremen's Act is a stevedore's exclusive remedy against his employer for shipboard injuries. 33 U. S. C. § 905. Representatives of maritime employees

would not equalize the remedies that both this Court
and Congress have recognized are available to long-
shoremen injured on navigable waters and those injured
ashore, whether in service of a ship or not.[13]   In part,
this differential treatment stems from the geographical
and historical accident that personal injuries on land are
covered, for the most part, by state substantive law while
such injuries on navigable water are generally governed
by federal maritime law.   These two bodies of law do
overlap and interpenetrate in some situations, and the
amphibious nature of the longshoreman's occupation cre-
ates frequent taxonomic problems.   In the present case,
however, the typical elements of a maritime cause of
action are particularly attenuated: respondent Law was
not injured by equipment that was part of the ship's
usual gear or that was stored on board, the equipment

successfully opposed the efforts of Congress to include seamen under
the Longshoremen's Act, see *Nogueira* v. *New York, New Haven &
Hartford R. Co.,* 281 U. S. 128, 136 (1930); *Warner* v. *Goltra,*
293 U. S. 155, 159–160 (1934), since seamen preferred to remain free
to proceed against their employer under the Jones Act, 41 Stat.
1007, 46 U. S. C. § 688, and under suits for unseaworthiness and/or
maintenance and cure.   The latter remedy has traditionally been
available to seamen but not to longshoremen, *Weiss* v. *Central
R. Co.,* 235 F. 2d 309, 311 (CA2 1956), and the Court has stated
that the remedies of an employee covered by the Longshoremen's
Act and those of a seaman covered under the maritime doctrine
of maintenance and cure are mutually exclusive.   *Norton* v. *Warner
Co.,* 321 U. S. 565, 570 (1944).   The Jones Act gives seamen, at
their election, the benefit of the provisions of the Federal Employers'
Liability Act, 35 Stat. 65, 45 U. S. C. § 51 *et seq.*   Longshoremen now
have no such election.   *Swanson* v. *Marra Bros., Inc.,* 328 U. S., at 7.
Although longshoremen may not obtain maintenance and cure, there
are certain circumstances under which they may recover for injuries
caused by unseaworthiness whether the accident occurred on board
ship, *Seas Shipping Co.* v. *Sieracki, supra,* or on the dock, *Gutierrez*
v. *Waterman S. S. Corp., supra.*

[13] See, *e. g., Nacirema Operating Co.* v. *Johnson,* 396 U. S., at
217–220.

that injured him was in no way attached to the ship, the forklift was not under the control of the ship or its crew, and the accident did not occur aboard ship or on the gangplank. Affirmance of the decision below would raise a host of new problems as to the standards for and limitations on the applicability of maritime law to accidents on land.[14] At least in the absence of explicit congressional authorization, we shall not extend the historic boundaries of the maritime law.

[14] The Fifth Circuit's expansive definition of loading (432 F. 2d, at 384) would be difficult to delimit. Already, summary judgment has been denied the shipowner where a warehouseman sued on an unseaworthiness theory after he had been injured by a power shovel he was using to transfer grain from a railroad car to a warehouse where it would be subsequently taken on board a ship. *Olvera* v. *Michalos*, 307 F. Supp. 9 (SD Tex. 1968). Summary judgment has also been denied when a longshoreman brought an unseaworthiness suit after he had been injured inside a pier shed; the "squeeze lift" truck he was driving struck an unidentified object on the shed floor causing the steering wheel to spin around and shatter plaintiff's wrist. *McNeil* v. *A/S Havtor*, 326 F. Supp. 226 (ED Pa. 1971). The attempt to define the process of "loading" for purposes of determining whether a longshoreman injured on shore can recover on an unseaworthiness claim has produced substantial confusion in the lower courts; the cases are impossible to rationalize. Denying compensation: *Forkin* v. *Furness Withy & Co.*, 323 F. 2d 638 (CA2 1963), *McKnight* v. *N. M. Paterson & Sons*, 286 F. 2d 250 (CA6 1960), cert. denied, 368 U. S. 913 (1961); *Henry* v. *S. S. Mount Evans*, 227 F. Supp. 408 (Md. 1964); *Sydnor* v. *Villain & Fassio e Compania*, 323 F. Supp. 850 (Md. 1971). Awarding compensation or denying summary judgment for defendant: *Spann* v. *Lauritzen*, 344 F. 2d 204 (CA3), cert. denied, 382 U. S. 938 (1965); *Chagois* v. *Lykes Bros. S. S. Co.*, 432 F. 2d 388 (CA5 1970); *Olvera* v. *Michalos*, *supra*; *McNeil* v. *A/S Havtor*, *supra*. Reliance upon the gangplank line as the presumptive boundary of admiralty jurisdiction, except for cases in which a ship's appurtenance causes damage ashore, recognizes the traditional limitations of admiralty jurisdiction, see nn. 2 and 3, *supra*, and decreases the arbitrariness and uncertainties surrounding amorphous definitions of "loading." Such uncertainties may prejudice both the longshoreman and the employer.

Without necessarily disagreeing with the proposition that the hazards of the longshoreman's occupation make him especially deserving of a remedy dispensing with proof of fault,[15] we are constrained to note that the longshoreman already has a remedy under state workmen's compensation laws that does not depend upon proving derelictions on the part of his employer. Recovery without proving negligence is not the issue here; nor is it the equities of the injured longshoreman's position as against those of the shipowner who has had and exercises no control whatsoever over the use of the stevedore's equipment on the dock. What is at issue is the *amount* of the recovery, not against a shipowner, but against the stevedore employer. As this case illustrates, the shipowner's liability for unseaworthiness would merely be shifted, with attendant transaction costs, to the stevedore by way of a third-party action for indemnity. *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.*, 350 U. S. 124 (1956). The State's own arrangements for compensating industrial accidents would be effectively circumvented.

Perhaps such laws provide inadequate benefits, but we are poorly positioned to conclude that they do or for that reason to give special remedies to longshoremen when other employees operating forklifts for other employers in perhaps equally hazardous circumstances are

---

[15] A 1956 survey, based on 1954 data, concluded that the stevedoring occupation had a higher injury frequency rate than any other high-hazard industry studied. National Academy of Sciences-National Research Council, Maritime Cargo Transportation Conference, Longshore Safety Survey Report, Longshore Safety Survey: A Survey of Occupational Hazards in the Stevedore Industry 23 (1956). See also U. S. Dept. of Labor, Bureau of Labor Statistics, Handbook of Labor Statistics 1971, p. 345, for a comparison of the work-injury rate (both by severity and frequency) in the marine cargo handling industry with that in other industries. Cf. Note, Risk Distribution and Seaworthiness, 75 Yale L. J. 1174 (1966).

left to the mercies of state law. Claims like these are best presented in the legislative forum, not here.

This is particularly true since extending the constitutional boundaries of the maritime law would not require Congress to make an equivalent extension of the jurisdiction of the federal courts sitting in admiralty. Congress might well prefer not to extend the jurisdiction of the federal courts. On the other hand, if denying federal remedies to longshoremen injured on land is intolerable, Congress has ample power under Arts. I and III of the Constitution to enact a suitable solution.[16]

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

*Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S. 206, involved an injury to a longshoreman while he was on the dock unloading the ship. The injury was not inflicted by a defective appliance of the ship. He merely slipped on loose beans spilled on the dock from defective cargo containers belonging to the ship. Here the longshoreman was engaged in a phase of a loading operation; he was on the dock stacking cargo for loading and the appliance causing the injury belonged to the stevedore company.

The Court of Appeals properly concluded that that work was part of the loading process and that therefore the longshoreman was in the service of the ship. That gives pragmatic, realistic meaning to the concept of load-

---

[16] Cf., *e. g., The Propeller Genesee Chief* v. *Fitzhugh,* 12 How. 443, 457–458 (1852); *Richardson* v. *Harmon,* 222 U. S. 96, 97 (1911); *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 385–388 (1924); *Detroit Trust Co.* v. *The Thomas Barlum,* 293 U. S. 21, 52 (1934); *Swanson* v. *Marra Bros., Inc., supra,* at 5; *O'Donnell* v. *Great Lakes Dredge & Dock Co., supra,* at 40–41.

ing and avoids the narrow, grudging, hypertechnical definition.

Loading is activity that involves work on the ship and on the dock. Longshoremen are both shipside workers and shoreside workers and move back and forth from deck to dock. At times an individual worker may be using the ship's appliances and a moment later the stevedore's appliances. But the work does not change in character. For example, although prior to his injury Law had normally been involved in loading or unloading, his specific assignments varied. On some days he was assigned to drive a forklift on board ship. On others, such as the day of the injury, he shuttled cargo between various points on the dock during the loading process. Respondent was subject to all the risks and hazards of loading the ship; and the humanitarian policy of the admiralty law has been to allow those who so service the ship to receive the protections usually afforded that class.

Equipment need not belong to the ship to be an appurtenance of the ship; and it may be such even though it belongs to the stevedore. We so held in *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396,[1] over the strenuous dissent of Mr. Justice Burton, joined by Mr. Justice Frankfurter and Mr. Justice Jackson. The critical question is whether the injury occurred during loading or unloading.[2] We there allowed recovery for injury to a longshoreman which occurred while he was loading the ship on the deck and which was caused by a defective block used by the stevedore company. And we followed

---

[1] Accord: *Spann* v. *Lauritzen,* 344 F. 2d 204; *Chagois* v. *Lykes Bros. S. S. Co.,* 432 F. 2d 388; *Huff* v. *Matson Navigation Co.,* 338 F. 2d 205; *Thorson* v. *Inland Navigation Co.,* 270 F. 2d 432; *Ace Tractor & Equipment Co.* v. *Olympic S. S. Co.,* 227 F. 2d 274.

[2] See the Appendix to this opinion.

that decision in *Rogers* v. *United States Lines*, 347 U. S. 984, the same three Justices dissenting.

I would adhere to our decisions in the *Petterson* and *Rogers* cases and affirm the judgment of the Court of Appeals.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

This Court's decisions have rather consistently reflected the principle that because loading and unloading of vessels are abnormally dangerous such risks ought to be placed initially upon the shipowners and ultimately passed on through higher prices to the customers of the shipping industry.[1] See *International Stevedoring Co.* v. *Haverty*, 272 U. S. 50 (1926); *Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52 (1914). The most well-known explication of this principle was advanced in *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85, 93–96 (1946), which held that longshoremen, as well as seamen, were entitled to recover under the doctrine of unseaworthiness for injuries sustained aboard ship:

"That the liability may not be either so founded or so limited would seem indicated by the stress

---

[1] Stevedoring is one of the most accident-prone professions in American industry. According to the National Academy of Sciences-National Research Council, Maritime Cargo Transportation Conference, Longshore Safety Survey 22–23 (1956), hazardous industries have the following accident frequency rates:

Stevedoring ................ 92.3 per million man hours worked
Logging ................... 74.3
Structural Steel Erection..... 47.5
Saw and Planing Mills........ 42.0
General Building............. 37.0

See also New York Shipping Assn., Safety Bureau, Annual Accidents (1965).

the cases uniformly place upon its relation, both in character and in scope, to the hazards of marine service which unseaworthiness places on the men who perform it. These, together with their helplessness to ward off such perils and the harshness of forcing them to shoulder alone the resulting personal disability and loss, have been thought to justify and to require putting their burden, in so far as it is measurable in money, upon the owner regardless of his fault. Those risks are avoidable by the owner to the extent that they may result from negligence. And beyond this he is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its cost.

.        .        .        .        .

"All the considerations which gave birth to the liability and have shaped its absolute character dictate that the owner should not be free to nullify it by parcelling out his operations to intermediary employers whose sole business is to take over portions of the ship's work or by other devices which would strip the men performing its service of their historic protection. The risks themselves arise from and are incident in fact to the service, not merely to the contract pursuant to which it is done. The brunt of loss cast upon the worker and his dependents is the same, and is as inevitable, whether his pay comes directly from the shipowner or only indirectly through another with whom he arranges to have it done. The latter ordinarily has neither right nor opportunity to discover or remove the cause of the peril and it is doubtful, therefore, that he owes to his employees, with respect to these hazards, the employer's ordinary duty to furnish a safe place to

work, unless perhaps in cases where the perils are obvious or his own action creates them. If not, no such obligation exists unless it rests upon the owner of the ship. Moreover, his ability to distribute the loss over the industry is not lessened by the fact that the men who do the work are employed and furnished by another. Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew. *Florez* v. *The Scotia*, 35 F. 916; *The Gilbert Knapp*, 37 F. 209, 210; *The Seguranca*, 58 F. 908, 909. That the owner seeks to have it done with the advantages of more modern divisions of labor does not minimize the worker's hazard and should not nullify his protection."

Although subsequent holdings sustaining the applicability of the doctrine of unseaworthiness might alternatively have been grounded in more mechanical rules, the language of the cases has instead been the broader principle explicated in *Sieracki*. For example, in *Reed* v. *The Yaka*, 373 U. S. 410, 414–415 (1963), holding that a longshoreman was not deprived by the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U. S. C. § 901 *et seq.*, of his unseaworthiness remedy merely because the shipowner happened also to be his stevedore-employer, the Court relied upon the policy expressed in *Sieracki:*

"[W]e pointed out several times in the *Sieracki* case, which has been consistently followed since, that a shipowner's obligation of seaworthiness cannot be shifted about, limited, or escaped by contracts or by the absence of contracts and that the shipowner's obligation is rooted, not in contracts, *but in the hazards of the work.*" (Emphasis added.)

Similarly, the "humanitarian policy" rather than the more mechanical, albeit historical, maritime tests was the starting point in *Waldron* v. *Moore-McCormack Lines,* 386 U. S. 724, 728 (1967):

> "When this Court extended the shipowner's liability for unseaworthiness to longshoremen performing seamen's work, *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85—either on board or on the pier, *Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S. 206, either with the ship's gear or the stevedore's gear, *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396, either as employees of an independent stevedore or as employees of a shipowner *pro hac vice, Reed* v. *The Yaka,* 373 U. S. 410—we noted that 'the hazards of marine service, the helplessness of the men to ward off the perils of unseaworthiness, the harshness of forcing them to shoulder their losses alone, and the broad range of the "humanitarian policy" of the doctrine of seaworthiness,' *id.,* at 413, should prevent the shipowner from delegating, shifting, or escaping his duty by using the men or gear of others to perform the ship's work."

A straightforward application of the *Sieracki* principle to the instant circumstances would clearly warrant recovery by Law, if his allegations are proved at trial, under the doctrine of unseaworthiness. He was driving a forklift laden with cargo which was to be hoisted aboard the S. S. *Sagamore Hill.* As he drove along the dock, a defective overhead rack became disengaged and crashed upon his head. The Court of Appeals correctly concluded that his activity had been part of the loading process and was protected by the *Sieracki* principle. And at least two other circuits have made similar conclusions under analogous conditions. See *Huff* v. *Mat-*

*son Navigation Co.,* 338 F. 2d 205 (CA9 1964); *Spann* v. *Lauritzen,* 344 F. 2d 204 (CA3 1965); see also *Chagois* v. *Lykes Bros. S. S. Co.,* 432 F. 2d 388 (CA5 1970).

By ignoring completely the underlying reasoning of these cases and by focusing instead on the narrow facts involved in each of them, the majority gives short shrift to the policy of distributing loading and unloading risks of personal injury to the users of the shipping industry. The Court places special emphasis on the alignment in this case of three factual elements: (a) an injury to a longshoreman (rather than a seaman), (b) upon a dock (rather than upon a deck), (c) caused by defective equipment supplied by the stevedoring contractor (rather than by the shipowner). Thus the majority finds *Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S. 206 (1963), inapposite even though it involved both the first and second conditions,[2] and presumably would view *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396 (1954), inapposite even though it concerned both the first and last conditions.[3] But the mere fact that this Court has never decided a controversy composed of these precise elements is not an adequate reason for excepting such a circumstance from the scope of the *Sieracki* principle.

The majority offers three reasons for the exception. First, the Court seems to argue that the *Sieracki* principle has already been limited by *Nacirema Operating Co.* v. *Johnson,* 396 U. S. 212 (1969), holding that Congress did not intend that the Longshoremen's and Harbor Workers' Compensation Act would apply to *any* injury occurring off a ship. In *Johnson,* however, the Court

---

[2] Accord: *Rogers* v. *United States Lines,* 347 U. S. 984 (1954); *Spann* v. *Lauritzen,* 344 F. 2d 204 (CA3 1965); *Huff* v. *Matson Navigation Co.,* 338 F. 2d 205 (CA9 1964); *Chagois* v. *Lykes Bros. S. S. Co.,* 432 F. 2d 388 (CA5 1970).

[3] Accord: *Strika* v. *Netherlands Ministry of Traffic,* 185 F. 2d 555 (CA2 1950).

clearly acknowledged that Congress' constitutional maritime power does not cease at the shoreline. *Id.*, at 223–224. And, obviously, the reach of 28 U. S. C. § 1333, conferring upon district courts original admiralty and maritime jurisdiction, as extended by the Admiralty Extension Act of 1948, 62 Stat. 496, 46 U. S. C. § 740, is not governed by the reach of the Harbor Workers' Act. In fact, the Court, while denying a compensation remedy under the Harbor Workers' Act, noted that an action for unseaworthiness would lie against the ship. 396 U. S., at 223 n. 19.

The primary reason offered to support the majority's exception to the *Sieracki* principle is that it is for Congress rather than the judiciary to determine the adequacy of state workmen's compensation laws, which, under the Court's holding, will now be the only remedy available to a longshoreman injured ashore during loading or unloading by pier-based equipment of the stevedoring contractor. See *Nacirema Operating Co.* v. *Johnson, supra.* While Congress, of course, is better equipped for precision analysis than a judicial forum, the courts have not been unaware that state workmen's compensation statutes provide puny awards compared to jury evaluations of personal injuries. See W. Prosser, The Law of Torts 555 (3d ed. 1964). Limited recovery was thought to have been necessary by most state legislatures in order to offset the imposition against an employer's liability regardless of fault. In keeping with admiralty courts' traditional solicitude for those injured in the maritime trade,[4] the Court did not defer to Congress in other instances approving longshoremen's recoveries even though it might also have been argued in those cases that the Harbor Workers' Act or state schemes

---

[4] See *Dixon* v. *The Cyrus*, 7 F. Cas. 755 (No. 3,930) (Pa. 1789). See also *Peterson* v. *The Chandos*, 4 F. 645, 650 (Ore. 1880).

might have been adequate.[5] No reason is suggested why deference is needed in these circumstances. In any event, referring a litigant to Congress is normally appropriate where the Court is reluctant to accept his invitation to upset an established rule. Inasmuch as the *Sieracki-Petterson-Gutierrez* principle would appear to be the controlling precedent, the appropriate referral to the legislative process ought to be *Victory Carriers,* not *Law.*

Finally the majority says that: "Affirmance of the decision below would raise a host of new problems as to the standards for and limitations on the applicability of maritime law to accidents on land." Such problems were quickly brushed aside in *Gutierrez, supra,* at 210, in which "[v]arious far-fetched hypotheticals [were] raised, such as a suit in admiralty for an ordinary automobile accident involving a ship's officer on ship business in port, or for someone's slipping on beans that continue to leak from [defective cargo] bags in . . . Denver." Said the Court: "We think it sufficient for the needs of this occasion to hold that the case is within the maritime jurisdiction under 46 U. S. C. § 740 when . . . it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act." As in *Gutierrez,* the accident here occurred on the dock, and the specter of troubling hypotheticals elsewhere ought not to deter landward extension to loading or unloading injuries on the dock. Moreover, if a bright-line test is desirable, then the *Sieracki* policy would be

---

[5] *Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S. 206 (1963); *Reed* v. *The Yaka,* 373 U. S. 410 (1963); *Alaska S. S. Co.* v. *Petterson,* 347 U. S. 396 (1954); *Pope & Talbot, Inc.* v. *Hawn,* 346 U. S. 406 (1953); *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946); *International Stevedoring Co.* v. *Haverty,* 272 U. S. 50 (1926); *Atlantic Transport Co.* v. *Imbrovek,* 234 U. S. 52 (1914).

less offended by a bright line drawn around both the ship and the dock than by a line cast only about the vessel.  Statistical evidence suggests that the great bulk of high-risk maritime activity occurs on the ship and the adjoining pier.  National Academy of Sciences—National Research Council, Maritime Cargo Transportation Conference, Longshore Safety Survey 75 (1956). See Comment, Risk Distribution and Seaworthiness, 75 Yale L. J. 1174, 1190 (1966).