# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 01-2908

RUSSELL A. SCOTT and LAUREN SCOTT,

*Plaintiffs-Appellants,*

v.

TRUMP INDIANA, INC., a corporation;
LOLA CRANE RENTAL COMPANY, a
corporation; and MARK NICHOLS,

*Defendants-Appellees,*

and

MGI AMERICA, INC., a corporation, d/b/a
TOTAL MARINE SAFETY CENTER,

*Defendant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2001—**John A. Nordberg**, *Judge.*

———————

ARGUED FEBRUARY 21, 2002—DECIDED JULY 28, 2003

———————

Before FLAUM, *Chief Judge,* and HARLINGTON WOOD, JR.
and WILLIAMS, *Circuit Judges.*

HARLINGTON WOOD, JR., *Circuit Judge.* Plaintiff-appellant Russell Scott ("Scott") was seriously injured on April 4, 1997, while standing on a pier at Buffington Harbor, Indiana. At the time of his injury, Scott was employed as the training director for MGI America, Inc., d/b/a Total Marine

Safety Center ("Total Marine"). Total Marine was engaged in the business of fulfilling safety requirements for owners of marine vessels. Total Marine contracted with Trump Indiana, Inc. to design, install, and maintain the lifesaving equipment required by the United States Coast Guard for the vessel *Trump Casino*, a gambling establishment.[1] As a part of its agreement with Trump Indiana, Total Marine supplied and serviced the *Trump Casino*'s life rafts and provided life raft training to *Trump Casino* employees.

Scott was an experienced seaman, having served in the U.S. Coast Guard for over twenty years prior to beginning his career with Total Marine. As a part of his job with Total Marine, Scott developed a training course on the deployment of life rafts and the safe evacuation of a ship in the event of trouble. Scott taught this course to personnel from the *Trump Casino* and other Total Marine clients. The majority of the training was conducted at the Total Marine facility located in Mokena, Illinois; however, Scott estimated that he spent about twenty-five percent of his time on clients' vessels, either "servicing or doing needs analysis, developing training or doing on-site training."

On April 4, 1997, a life raft drill was held for the *Trump Casino*. This drill was required by the U.S. Coast Guard to prove satisfactory operation of the *Trump Casino*'s life safety system. Scott was present during the drill, spending time both on the *Trump Casino* and on land. As a part of the drill, one of the *Trump Casino*'s life rafts was inflated and deployed into the water by *Trump Casino* personnel. While the life raft was being launched, Scott observed the drill from the upper decks of the *Trump Casino* to evaluate whether *Trump Casino* employees launched the raft correctly. After the raft was launched, it was towed to an aux-

---

[1]  The U.S. Coast Guard is the governing marine authority for the vessel *Trump Casino*.

iliary pier to be lifted out of the water and placed on a truck for transport to the Total Marine facility where the raft would be inspected and repackaged for eventual return to the *Trump Casino.*

While most vessels the size of the *Trump Casino* have a crane on-board, the *Trump Casino* did not. Therefore, prior to the drill, Total Marine hired Lola Crane to provide a hydraulic truck crane and crane operator to lift the inflated life raft from the water. Mark Nichols drove the truck crane to Buffington Harbor and positioned the crane on the auxiliary pier. When the deployed raft was brought to the auxiliary pier, Total Marine employees who were in the raft connected the crane ball to the raft. While other employees of Total Marine were actually in the life raft during the drill, Scott himself never entered the life raft. Scott was standing on the auxiliary pier when the life raft was being lifted out of the water. As Nichols used the crane to lift the boat out of the water and across the pier, a gust of wind caused the boat to sway. The boat struck Scott in the head, and Scott suffered a severe closed head injury with massive intra-cerebral swelling requiring a craniotomy.

On April 3, 2000, Scott and his wife, Lauren Scott, filed a six-count complaint in the United States District Court for the Northern District of Illinois. Counts I and II alleged claims against Total Marine under the Jones Act, 46 U.S.C. § 688 *et seq*. Counts III and IV alleged claims against Trump Indiana under § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905. Counts V and VI alleged claims against Lola Crane and crane operator Mark Nichols under general maritime jurisdiction, 28 U.S.C. § 1333.[2]

---

[2]  We will use the terms "maritime jurisdiction" and "admiralty jurisdiction" interchangeably throughout this opinion because the cases we will discuss use both terms.

The district court granted summary judgment in favor of Lola Crane and Nichols on February 22, 2001, stating the Scotts failed to satisfy the requirements of federal admiralty jurisdiction in their claims against these defendants. Specifically, the district court held that Scott's injury was not caused by a vessel on navigable waters. On February 27, 2001, the district court granted Total Marine's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), holding that the Scotts failed to make any allegations of facts that could arguably establish jurisdiction under the Jones Act. On June 19, 2001, the district court granted summary judgment in favor of Trump Indiana. While noting it had doubts as to whether Scott was covered by the LHWCA, the court held that, even assuming Scott would be covered by the LHWCA, there was no evidence of any negligence by the *Trump Casino*. The Scotts filed a timely notice of appeal, challenging the district court's rulings with respect to Lola Crane, Nichols, and Trump Indiana. The Scotts do not appeal the court's ruling on Total Marine's Rule 12(b)(6) motion to dismiss.

## ANALYSIS

### A.   *Lola Crane and Mark Nichols*

We review a district court's legal determination as to whether subject matter jurisdiction exists *de novo*, while the district court's factual determinations are reviewed for clear error. *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 381 (7th Cir. 2001). Article III of the Constitution grants federal jurisdiction over "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. Under 28 U.S.C. § 1333, "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, . . . ." Traditionally, admiralty tort jurisdiction existed only when the tort in question occurred on navigable waters. *Jerome B.*

*Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531-32 (1995). However, in 1948, Congress enacted the Extension of Admiralty Jurisdiction Act, 48 U.S.C. app. § 740, which provides, "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

Following the Extension of Admiralty Jurisdiction Act, courts have established a two-part test to use in determining whether admiralty jurisdiction exists. "A party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Grubart*, 513 U.S. at 534. "A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Id.* (citing 46 U.S.C. app. § 740). The connection with maritime activity assessment, also known as the nexus test, examines two issues, first, whether the incident in question has "a potentially disruptive effect on maritime commerce," and second, "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Weaver*, 255 F.3d at 382 (internal quotations and citations omitted).

We focus first on the location prong. It is undisputed that the alleged tort did not occur on navigable water. Therefore, for admiralty jurisdiction to exist, Scott's injury must have been "caused by" the vessel *Trump Casino*. The Supreme Court has interpreted the Extension of Admiralty Jurisdiction Act's use of the phrase "caused by" as requiring proximate causation. *Grubart*, 513 U.S. at 536. For purposes of the locality test, an "appurtenance" to a vessel is treated as part of the vessel itself. *Id.* at 535. We must determine, therefore, whether Scott's injury was caused by an appurte-

nance to the *Trump Casino*. Appellants contend that it was, arguing that both the life raft and the crane qualify as appurtenances.

Appellants liken their case to *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 209-10 (1963), in which the Supreme Court held jurisdiction existed under the Extension of Admiralty Jurisdiction Act when a longshoreman was injured after slipping on loose beans that had leaked from a defective cargo container which had been unloaded from a ship. The *Gutierrez* court held the cargo containers constituted a part of the ship's "gear." *Id.* at 215. In its later decision in *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 210-11 (1971), the Supreme Court characterized its decision in *Gutierrez* as turning "upon the fact that [Gutierrez's] injury was caused by an appurtenance of a ship, the defective cargo containers."

The Supreme Court in *Victory Carriers* again addressed an injury to a longshoreman working on a pier. In *Victory Carriers*, the plaintiff was injured while driving a forklift truck on a pier where the *S.S. Sagamore Hill* was docked. As the plaintiff was operating the forklift, the forklift's overhead protection rack came loose and fell on him, injuring him. *Victory Carriers*, 404 U.S. at 203. At the time of his injury, plaintiff was moving cargo to a point from which it would eventually be hoisted onto the *Sagamore Hill* by the ship's own gear. *Id.* The forklift at issue was owned by plaintiff's stevedore employer. *Id.* Declining to "extend the reach of federal law to pier-side accidents caused by a stevedore's pier-based equipment," the Supreme Court held maritime law did not apply. *Id.* at 204.

The Eleventh Circuit recently addressed the question of when an item is an appurtenance to a vessel in *Anderson v. United States*, 317 F.3d 1235 (11th Cir. 2003), *petition for cert. filed*, 71 U.S.L.W. 3791 (U.S. Apr. 7, 2003) (No. 02-1822). The plaintiff in *Anderson* was injured when an aircraft launched from the aircraft carrier *USS John F.*

*Kennedy* during a training mission released two bombs which missed their target and impacted near Anderson's work site. *Id.* at 1236. The Eleventh Circuit held that the aircraft was an appurtenance to the *Kennedy* at the time of Anderson's injuries. *Id.* at 1238. In reaching this conclusion, the court noted the following definition of an appurtenance: "'any specifically identifiable item that is destined for use aboard a specifically identifiable vessel and is essential to the vessel's navigation, operation, or mission.'" *Id.* (quoting *Gonzalez v. M/V Destiny Panama*, 102 F.Supp.2d 1352, 1354-57 (S.D. Fla. 2000)). The court found that the aircraft was assigned to the *Kennedy* and was housed on the ship, that its operations were controlled by personnel aboard the *Kennedy* at all times, and that, at the time Anderson was injured, the aircraft was carrying out the *Kennedy*'s mission. *Id.*

Turning to the facts of the present case, it is clear that the crane was not an appurtenance to the *Trump Casino*. The crane was a completely land-based piece of equipment that was hired by Total Marine for one day. The fact that other vessels the size of the *Trump Casino* generally have a crane on-board is immaterial. The crane in the present case was never aboard the *Trump Casino*. It was not mounted on or in any way physically connected to the vessel. Additionally, the crane was never under the control of *Trump Casino* personnel. Total Marine hired Lola Crane, and Nichols drove the crane to the pier and operated it. Considering all the relevant case law, the crane is most similar to the forklift at issue in *Victory Carriers*. The crane was not stored on board or a part of the ship's usual gear, it was not attached to the ship in any way, it was not under the control of the *Trump Casino* or its crew, and Scott's injury did not occur aboard the ship or on its gangplank. *See Victory Carriers*, 404 U.S. at 213-14. Were we to adopt appellants' argument, we would be extending the bounds of admiralty jurisdiction to include a pier-side accident caused

by a pier-based piece of equipment that was not owned or operated by a vessel or its crew. This is a step that we, like the Supreme Court in *Victory Carriers*, are unwilling to take.

The determination as to whether the life raft was an appurtenance of the *Trump Casino* is a closer question. Appellants characterize the life raft as "equipment of the Trump vessel which was in the course of a 'round trip' to be deflated, repacked and eventually replaced as part of the vessel's safety requirements." Clearly, the life raft was a part of the *Trump Casino*'s usual gear. Additionally, a satisfactory life safety system was required to allow the *Trump Casino* to operate. However, unlike the aircraft in *Anderson*, which was controlled at all times by personnel aboard the *Kennedy*, *see Anderson*, 317 F.3d at 1238, at the time of Scott's injury, the life raft was not under the control of *Trump Casino* personnel. *See also Victory Carriers*, 404 U.S. at 214 (noting that at the time of the injury the forklift was not under the control of the ship or its crew). Total Marine employees attached the life raft to the crane ball, and, as appellants note in their brief, "Nichols was in control of the lifting procedure at all times." Given the unique facts of this case, we believe that at the time the life raft was being hoisted across the pier by Nichols, it could no longer be considered an appurtenance of the *Trump Casino*.

However, even assuming the life raft could be considered an appurtenance at the time of Scott's injury, appellants fail to allege the life raft proximately caused Scott's injury. Unlike the situation in *Gutierrez*, Scott's injury was not caused by a defect in the life raft. The present case is similar to *Margin v. Sea-Land Services, Inc.*, 812 F.2d 973 (5th Cir. 1987). In *Margin*, the plaintiff was injured when he slipped while attempting to avoid being struck by a hatch cover from the *M/V Boston*, which was being lowered by a dock-based crane that was owned and operated by a ste-

vedoring company. *Id.* at 974. The Supreme Court examined *Margin* in a footnote in *Grubart*, noting that the case "turned not on the condition of the hatch cover, the putative appurtenance, but on the fact that the plaintiff did not allege that 'vessel negligence proximately caused his injury.'" *Grubart*, 513 U.S. at 535 n.1 (quoting *Margin*, 812 F.2d at 977). In their claims against Lola Crane and Nichols, appellants do not allege the life raft caused Scott's injury. Rather, appellants contend that Scott's injury resulted from the negligent and careless maintenance, operation, and control of the crane. Based on the record evidence, it cannot be said that Scott's injuries were caused by a vessel in navigable waters or its appurtenances. Because the Scotts cannot satisfy the locality test, general admiralty jurisdiction does not exist for their claims against Lola Crane and Nichols, and we need not address the nexus test. State, not federal, law governs any claims the Scotts may have against Lola Crane and Nichols. We vacate the district court's grant of summary judgment and dismiss the Scotts' claims against Lola Crane and Nichols for lack of subject matter jurisdiction.

### B.   Trump Indiana

In Counts III and IV of their complaint, the Scotts alleged claims against Trump Indiana under § 905(b) of the LHWCA. Trump Indiana moved for summary judgment, arguing that Scott was not covered by the LHWCA. For purposes of analysis, the district court assumed Scott fell under the protection of the LHWCA. Nevertheless, the court granted summary judgment in favor of Trump Indiana, holding that there was no evidence of any negligence by the *Trump Casino*.

We review a district court's grant of summary judgment *de novo. Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). Summary judgment is appropriate when the record, viewed in the light most favorable to the non-

moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In our analysis, we view the evidence in the light most favorable to the Scotts and draw all reasonable inferences in their favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Under § 905(b) of the LHWCA,

> [i]n the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title.

33 U.S.C. § 905(b). The coverage section of the LHWCA, 33 U.S.C. § 903, provides,

> compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, maritime railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a). The LHWCA was amended in 1972 to define the term "employee" to mean "any person engaged in maritime employment, including any longshoreman or

other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3). In 1984, § 902(3) was amended to specifically exclude from coverage various categories of workers if the individuals are covered by a state workers' compensation law. 33 U.S.C. § 902(3)(A)-(H). Section 902(3)(D) expressly excludes "individuals who (i) are employed by suppliers, transporters, or vendors, (ii) are temporarily doing business on the premises of an employer [as defined in the Act], and (iii) are not engaged in work normally performed by employees of that employer under this chapter."

While basing its decision on a different issue, the district court noted that Scott appeared "to be potentially excluded [from LHWCA coverage] by the vendor exception," 33 U.S.C. § 902(3)(D). However, before we reach the § 902(3) exceptions, we must examine the threshold question of whether Scott was engaged in maritime employment. *See Bienvenu v. Texaco, Inc.*, 164 F.3d 901, 909 (5th Cir. 1999) (en banc) ("If a person who would otherwise be covered under the LHWCA does the type of work enumerated by one of these amendments and is covered by a state workman's compensation act, he is not covered by the LHWCA."). The Supreme Court examined the term "maritime employment" in *Herb's Welding, Inc. v. Gray*, 470 U.S. 414 (1985), noting that in enacting the 1972 Amendments to the LHWCA, "Congress did not seek to cover all those who breathe salt air.*" Id.* at 423. The Court interpreted Congress's purpose as covering "those workers on the situs who are involved in the essential elements of loading and unloading; it is 'clear that persons who are on the situs but not engaged in the overall process of loading or unloading vessels are not covered.'" *Id.* (quoting *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 267 (1977)). The Court noted that while the term "maritime employment" was not limited to the occupations specifically listed in § 902(3), that is "any

longshoreman or other person engaged in longshoring oper-
ations, and any harbor-worker including a ship repairman,
shipbuilder, and ship-breaker," neither could "it be read to
eliminate any requirement of a connection with the loading
or construction of ships." *Id.* at 423-24.

Under the facts of this case, Scott cannot show that he
was involved in maritime employment. Scott's position with
Total Marine was Director of Training. As such, he spent
his time on clients' vessels "servicing or doing needs anal-
ysis, developing training or doing on-site training." While
Scott's brief states he was "directing" a safety drill at the
time he was injured, there is no evidence to that effect.
Scott, in his affidavit, stated he was "participating" in the
drill. The evidence in the record shows Scott was not an
active participant but rather observed the drill from the
vessel's upper deck and from land. As the Scotts' acknowl-
edge in their Statement of Facts, "[a] successful demonstra-
tion for the Coast Guard *by Trump crew members* was
necessary to enable the Trump vessel to operate on the
navigable waters of Lake Michigan." (emphasis added).
Scott was not involved in maritime employment, and there-
fore, he falls outside the scope of the LHWCA. The district
court correctly granted summary judgment in favor of
Trump Indiana.

## CONCLUSION

Appellants' claims against Lola Crane and Mark Nichols
are DISMISSED for lack of subject matter jurisdiction. The
district court's grant of summary judgment in favor of
Trump Indiana is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*