**STEWART & STEVENSON SERVICES, INC., Plaintiff,**

v.

**The M/V CHRIS WAY MacMILLAN, Defendant.**

**No. 4:94CV191–JDO.**

United States District Court,
N.D. Mississippi,
Greenville Division.

June 20, 1995.

Charles M. Steen, New Orleans, LA, Dana E. Kelly, Jackson, MS, for plaintiff.

William R. Armstrong, Jr., Greenville, MS, for the Owner/Claimant.

Joel J. Henderson, Greenville, MS, for Intervenor.

*OPINION*

ORLANSKY, United States Magistrate Judge.

Plaintiff Stewart & Stevenson Services, Inc., as general contractor, entered into a written agreement with Hugh Mac Towing Corporation to refurbish and repower the M/V Chris Way MacMillan, defendant *in rem*, and owned by Hugh Mac. This is an action to foreclose a preferred ship mortgage securing the resulting indebtedness of Hugh Mac to plaintiff. The parties have consented to trial and entry of final judgment by the magistrate judge pursuant to 28 U.S.C. § 636(c). Plaintiff has moved for partial summary judgment in its favor and for an interlocutory sale of the M/V Chris Way MacMillan.

## I. *FACTS*

Hugh Mac is in the business of inland river towing. It owns five vessels, including the M/V Chris Way MacMillan, a documented vessel of the United States. The Chris Way sank on August 8, 1992 at New Orleans. The estimated cost of repair at the time it was raised was $2,000,000.00, a figure exceeding its then market and insurance value. The vessel was placed in drydock and remained there for over a year. The propellers and tail shafts were removed by Hugh Mac and stored at Louisiana Dry Dock in New Orleans. Hugh Mac later decided to repower and refurbish the Chris Way, and entered into an agreement for that purpose with plaintiff on November 3, 1993 (Exhibit C to the complaint). Incorporated in the agreement are detailed specifications describing the work to be done (Exhibit 2 to Hugh Mac's Objection to Plaintiff's Listing of Uncontested, Material Facts). The contract price for the work was $2,698,622.00 plus charges at rates specified in the agreement for extra and change orders. Pursuant to the agreement Hugh Mac also executed a First Preferred Ship Mortgage on the Chris Way in plaintiff's favor securing a maximum indebtedness of $3,000,000.00 (Exhibit A).[1] The agreement requires Hugh Mac, as progress payments are due, to execute a series of promissory notes naming plaintiff as payee, the notes plus any other amounts advanced by plaintiff to be secured by the ship mortgage up to the maximum of $3,000,000.00. Hugh Mac has executed and delivered to plaintiff notes in the amounts of $100,000.00, $200,000.00, and $213,785 (Exhibit B). Plaintiff alleges in the complaint that it has advanced in excess of $613,000.00 under the terms of the agreement.

The agreement provides that plaintiff, as general contractor, will perform certain of the work at its Harvey, Louisiana yard. This work includes removal of the generator engines, certain piping, and the main engines and gears. Plaintiff is to rebuild certain gears and other equipment, repair the generator engines, and furnish two new main engines and a new EMD gauge panel. All other work is to be performed by a subcontractor, Superior Boat Works, at its Greenville shipyard. Plaintiff is required to trans-

---

1. Plaintiff assigned the mortgage to Machinery Acceptance Corporation (MAC) on December 23, 1993. On July 18, 1994, shortly before these foreclosure proceedings were instituted, MAC reassigned the mortgage to plaintiff (Exhibit I to plaintiff's motion for partial summary judgment).

port all items repaired, rebuilt or furnished by it to Superior's Greenville yard.

Although the court has not been provided with the particulars, it is undisputed that at a time prior to the execution of the repair and repower agreement, the Chris Way was delivered to plaintiff for the purpose of obtaining a bid on the contemplated work. The propellers and tail shafts which were previously removed remained at Louisiana Dry Dock. Later the November 3, 1993 agreement was executed, and plaintiff began the work therein contracted for, including removal of the main engines and delivery of the hull of the Chris Way to the subcontractor's yard at Greenville. The two propellers and one of the tail shafts removed from the Chris Way and stored at Louisiana Dry Dock were later moved to plaintiff's Harvey, Louisiana facility. The other tail shaft was determined to be unusable until certain repairs could be completed, and a spare identical tail shaft stored by Hugh Mac at Bollinger Shipyard was moved to plaintiff's Harvey facility. The engines, propellers and one tail shaft removed from the Chris Way, as well as the Bollinger tail shaft, remain in the possession of plaintiff at its Harvey, Louisiana facility. The hull of the Chris Way is in the possession of Superior Boat Works at Greenville.[2]

On February 17, 1994 Hugh Mac filed for protection under Chapter 11 of the Bankruptcy Act, and on April 20, 1994 plaintiff instructed Superior Boat Works to suspend all work on the Chris Way. On May 19, 1994 plaintiff moved the bankruptcy court to compel Hugh Mac to assume or reject their executory contract (the Repair and Repower Agreement) and to modify the automatic stay. On July 7, 1994 the bankruptcy court lifted the stay to permit these foreclosure proceedings. The bankruptcy court also held that the repower agreement between plaintiff and defendant is an executory contract which is non-assumable by the debtor under 11 U.S.C. § 365(c)(2).

Plaintiff filed its complaint in this action on July 26, 1994, seeking to enforce its rights as mortgagee in a first preferred ship mortgage under the Ship Mortgage Act, 46 U.S.C. § 31321. The defendant vessel was arrested, and Superior Boat Works was named consent keeper. Hugh Mac has filed its claim as owner, and denies that the propellers and tail shafts are appurtenances of the Chris Way; denies that the propellers and tail shafts are covered by the mortgage; and denies that the Chris Way is a vessel within the meaning of 46 U.S.C. § 31301.[3]

Plaintiff has moved for a partial summary judgment declaring that the Chris Way, its engines, tackle, apparel, etc., including the propellers and tail shafts in possession of plaintiff, is liable for such amounts as are determined to be due and owing to plaintiff. Plaintiff also moves for an interlocutory sale of the Chris Way pursuant to Supplemental Admiralty Rule E(9)(b) on the ground that the vessel is deteriorating and the cost of keeping it under arrest is excessive.

Hugh Mac opposes the motion, contending that the mortgage is invalid, thereby divesting the court of subject matter jurisdiction; and, in the alternative, even if the mortgage is valid it does not apply to the propellers, tail shafts or the "old" engines. Hugh Mac also opposes interlocutory sale except as to the hull of the vessel.

## II. *Summary Judgment Standard*

▇▇▇ Summary judgment should be entered only if "... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. The party seeking summary judgment has the initial burden of demonstrating through the evidentiary materials that there is no actual dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). On motion for summary judgment, "[t]he inquiry performed is the thresh-

---

**2.** Technically, the Chris Way is in the custody of the marshal. It was at Superior's Greenville yard when arrested as a result of the filing of this action, and Superior was designated consent keeper by order dated July 29, 1994.

**3.** By order dated April 10, 1995 the court granted leave to intervene to Marine Systems, Inc., asserting a maritime lien against the Chris Way in the amount of $2,660.26. Marine Systems has taken no part in these motion proceedings.

old inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether this burden has been met, the court should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, supra*, at 322, 106 S.Ct. at 2552.

■■■ The summary judgment procedure does not authorize trial by affidavit. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc., supra*, at 255, 106 S.Ct. at 2513. Accordingly, a court may not decide any factual issues found in the record on motion for summary judgment, but if such material issues are present, the court must deny the motion and proceed to trial. *Impossible Elec. Techniques v. Wackenhut Protective Systems*, 669 F.2d 1026, 1031 (5th Cir.1982); *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981); *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir.1969).

■■■ Under the provisions of Rule 56(e), Federal Rules of Civil Procedure, a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett, supra*, at 324, 106 S.Ct. at 2553. The facts stated in uncontradicted affidavits must be accepted as true. However, the moving party must still show that he is entitled to judgment on those facts as a matter of law, and if he fails to discharge that burden he is not entitled to judgment, notwithstanding the apparent absence of a factual issue. 6, Pt. 2, Moore, *Federal Practice (2d Ed.)*, ¶ 56.22[2], pp. 56–1341 through 56–1344.

## III. *Is the mortgage valid?*

Hugh Mac argues in opposition to the motion that the mortgage is invalid because it was executed without any contemporaneous consideration and because the Chris Way is not a vessel within the meaning of the Ship Mortgage Act.

Plaintiff points out in rebuttal that counsel for Hugh Mac admitted at Hugh Mac's 30(b)(6) deposition[4] that the Chris Way is a vessel for purposes of the Act and that the mortgage is valid.

### (a) *Consideration*

■■■ Hugh Mac argues that the mortgage cannot become perfected before any debt has been incurred, *i.e.* that the debt was prospective and not due until the work was completed. Further, Hugh Mac contends that the mortgage was not in compliance with the Ship Mortgage Act because it was not filed in good faith, *i.e.* that it purported to represent a $3,000,000.00 debt when in fact the amount owed was considerably less than that. Since, according to Hugh Mac, the mortgage was not filed in compliance with the Act, Hugh Mac claims it is void and the court lacks subject matter jurisdiction. Hugh Mac has cited no authority for that proposition.

In rebuttal plaintiffs cite authorities to the effect that the Ship Mortgage Act expressly provides for future or contingent obligations. *See*, 46 U.S.C. § 31321(b)(3); H.R.Rep. No. 100–918, *reprinted in* 1988 *U.S.Code & Cong. News* at 6104, 6111 (definition of § 31321(b)(3) intended to included future financing); *Southland Financial Corp. v. Oil-*

---

4. Hugh Mac's corporate designee was J. Anthony Terrell, Marine Superintendent of Hugh Mac, but counsel of record, Honorable William R. Arm- strong, also testified on behalf of Hugh Mac at various times throughout the deposition.

*Screw Mary Evelyn,* 248 F.Supp. 520, 522 (E.D.La.1965) (use of mortgage to secure future advances is "widely accepted" commercial practice; obligation of mortgagee to extend credit is sufficient consideration for the mortgage).

The Ship Mortgage Act requires that a mortgage which includes any part of a documented vessel must be filed with the Secretary of Transportation, 46 U.S.C. § 31321(a)(1), and, in order to be eligible for filing, must:

"(1) identify the vessel;

(2) state the name and address of each party to the instrument;

(3) state, if a mortgage, the amount of the direct *or contingent* obligations (in one or more units of account as agreed to by the parties) that is *or may become* secured by the mortgage, excluding interest, expenses, and fees;

(4) state the interest of the grantor, mortgagor, or assignor in the vessel;

(5) state the interest sold, conveyed, mortgaged, or assigned; and

(6) be signed and acknowledged." 46 U.S.C. § 31321(b). (Emphasis supplied).

The Act provides that any mortgage filed in "substantial compliance" with § 31321 ". . . is valid against any person from the time it is filed with the Secretary." 46 U.S.C. § 31321(a)(2). Since the Act itself provides for mortgages securing contingent or prospective indebtedness, Hugh Mac's argument that the mortgage is not in compliance with the Act and therefore not filed in good faith is clearly not well taken.

### (b) *Is the Chris Way a "vessel" within the meaning of the Act?*

■ The court also finds Hugh Mac's argument that the Chris Way is not a vessel to be entirely without merit. Again, Hugh Mac cites no authority for its position. "Vessel" is defined by federal statute.

"The word 'vessel' includes every description of watercraft or other artificial contrivance, used or capable of being used, as a means of transportation on water." 1 U.S.C. § 3.

Cases cited by plaintiff as examples of what constitutes a "vessel" all support its position that the Chris Way is a vessel. *See, The Jack–O–Lantern,* 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922) (hull under construction is vessel subject to maritime lien); *McCarthy v. The Bark Peking,* 716 F.2d 130, 134 (2d Cir.1983) ("any capacity for use as seagoing transportation"); *The George W. Elder,* 206 Fed. 268, 270 (9th Cir.1913) (fact that craft was raised and towed to drydock for repairs in order to return to navigable status is evidence that she was vessel).

Having concluded that adequate consideration was had for the mortgage and that the Chris Way is a vessel within the meaning of the Ship Mortgage Act, the court also holds as a matter of law that the mortgage is valid and the court has subject matter jurisdiction of this action.

### IV. *If the mortgage is valid, is plaintiff entitled to foreclose?*

Hugh Mac argues that the filing of the bankruptcy petition was not an act of default under the terms of the mortgage; that breach has therefore not occurred; and that plaintiff is therefore not entitled to foreclose. Hugh Mac further contends that the promissory notes executed by it are not due and payable under their own terms, so that no default has been established, no amount of debt has been established, and no rights have been judicially determined which can be enforced against the Chris Way by foreclosure.

■ When a party to an executory contract files a bankruptcy petition the contract is considered breached if it is not assumed under a plan confirmed under Chapters 9, 11, 12 or 13. 11 U.S.C. § 365(g). Furthermore, 11 U.S.C. § 365(c)(2) provides that the Trustee may *not* assume an executory contract if it is a contract to make a loan or extend other debt financing to or for the benefit of the debtor or to issue a security of the debtor. The bankruptcy court held the repower agreement to be such an executory contract, and therefore non-assumable, and granted plaintiff's motion to lift the stay on that basis (Exhibit E to plaintiff's Motion for Partial Summary Judgement). Therefore, whether or not a plan has been confirmed by

the bankruptcy court, that court has determined that the contract at issue will not be assumed whenever the plan is confirmed, and it is therefore deemed breached under 11 U.S.C. § 365(g).

■ Further, as plaintiff argues, the very terms of the promissory notes secured by the mortgage provide that the filing of a bankruptcy petition constitutes a default (Exhibit B to the Complaint, at p. 2). Section 4.01(c) of the mortgage also provides that the non-observance of any conditions contained in the promissory notes or repower agreement constitutes an event of default. Thus, Hugh Mac's argument that bankruptcy does not constitute an act of default under the terms of the notes and the written agreement between the parties is plainly not well taken.

■ The court also rejects Hugh Mac's argument that the notes are not due and payable under the terms thereof, since the unnumbered eighth paragraph of each of the notes expressly provides that in the event of a default (defined in the preceding paragraph to include the filing of a bankruptcy petition) the

"... entire principal amount of this Note plus interest accrued hereon shall, without notice or action by the contractor, be immediately due and payable without presentment, demand, protest, notice of protest or dishonor or other notice of default of any kind, all of which are hereby expressly waived by the Owner."

Once again, Hugh Mac has failed to cite authorities in support of its position, which is contrary to the explicit provisions of the notes, mortgage, and repower agreement.

Accordingly, the court holds as a matter of law that default has occurred, and that plaintiff is entitled to foreclose the mortgage.

### V. Does the mortgage apply to the propellers, tail shafts and "old" engines of the Chris Way?

#### a) Propellers and Tail Shafts

Though the parties vigorously dispute the status of the propellers and tail shafts, there is no genuine issue of material fact which in any way affects resolution of the issue, which, under the circumstances of this case, is purely one of law.

The undisputed material facts, as established by the evidentiary materials submitted in support of and in opposition to plaintiff's motion, are as follows. Where more than one inference may be drawn from the facts, Hugh Mac, as the party opposing the motion, is given the benefit of the inference most favorable to its position.

In August, 1992 the M/V Chris Way Mac-Millan, a documented vessel of the United States, owned by Hugh Mac Towing Corporation, sank at Louisiana Dry Dock at New Orleans. It was promptly raised, and as a part of its settlement with the underwriter, Hugh Mac retained possession and ownership of the salvaged Chris Way. Hugh Mac was initially advised that it would be uneconomic to attempt to refurbish the Chris Way and return it to service. It was also advised to remove certain components and equipment from the Chris Way which could be utilized as spare parts for other vessels owned by Hugh Mac. Pursuant to that advice the propellers, tail shafts and certain electrical motors were removed from the vessel.

At the time of the sinking of the Chris Way, Hugh Mac owned and operated five towboats, including the Chris Way. One of them was the M/V Donald Cargill MacMillan, a sister ship of the Chris Way, which was in all significant respects identical to the Chris Way. The Chris Way and the Donald Cargill utilized identical propellers and tail shafts, so that such components taken from one ship could be used in the other.

Hugh Mac maintains an inventory of spare parts for use, when necessary, on its vessels. At the time of the sinking of the Chris Way that parts inventory included three propellers and three tail shafts. Two of the propellers and two of the tail shafts were kept at Bollinger Shipyard and the third propeller and shaft at Mississippi Marine. One of the propellers and one of the shafts at Bollinger would fit either the Chris Way MacMillan or the Donald Cargill MacMillan. The other two spares fit other vessels and could not be used on either the Chris Way or the Donald Cargill.

After the propellers and tail shafts were removed from the Chris Way they were considered by Hugh Mac to be a part of its spare parts inventory, but were not moved to Bollinger Shipyard in order to save expense. Because Hugh Mac did business with Louisiana Dry Dock, as well as Bollinger, it was able to leave the propellers and tail shafts removed from the Chris Way at Louisiana Dry Dock.

As matters stood at that time, Hugh Mac had in its spare parts inventory three propellers and three tail shafts which would fit the Donald Cargill MacMillan, two at Louisiana Dry Dock and one at Bollinger Shipyard. However, it never became necessary to install any of those propellers or shafts on the Donald Cargill. Meanwhile, the Chris Way remained at Louisiana Dry Dock, as did the propellers and shafts which had been removed from her.

Hugh Mac was later advised that it was feasible to refurbish and repower the Chris Way and return her to service. To that end, the Chris Way was moved from Louisiana Dry Dock to plaintiff's Harvey, Louisiana shipyard so that plaintiff could formulate a bid for the contemplated repair work. The propellers and tail shafts remained at Louisiana Dry Dock.

A written agreement dated November 3, 1993, as more particularly described at pp. 555–556, *supra,* was entered into between Hugh Mac and plaintiff for the refurbishing and repower of the Chris Way. The specifications incorporated in the agreement contain the following provisions concerning propellers and tail shafts.

"39. *Propeller:*
Receive P/S propellers and install.
"40. *Bolts-propeller:*
Set-up twenty-four (24) wheel bolts and recondition in lathe.
"41. *Tailshaft:*
Install P/S tailshafts and couplings. Set-up shafts in lathe & check." (Specifications, p. 22.)

It is thus clear from the agreement, and no party contends otherwise, that propellers and tailshafts were not to be supplied by plaintiff, but were to be provided by Hugh Mac. At the time the agreement was entered into it was contemplated by Hugh Mac that, unless it became necessary to install the propellers and tailshafts remaining at Louisiana Dry Dock on the Donald Cargill MacMillan, they would be utilized as the propellers and tailshafts on the refurbished and repowered Chris Way MacMillan. However, the two propellers and shafts removed from the Chris Way remained at Louisiana Dry Dock even after plaintiff began work under the terms of the agreement and the hull of the Chris Way was moved to the Greenville yard of Superior Boat Works.

Hugh Mac determined at an unspecified time that one of the tail shafts removed from the Chris Way was damaged and therefore could not be utilized in the refitting of the Chris Way. It then determined that, unless it became necessary to install the tail shaft at Bollinger Shipyard on the Donald Cargill MacMillan, it would be utilized in the refitting of the Chris Way. Meanwhile, the propellers and shafts removed from the Chris Way remained at Louisiana Dry Dock, and the Bollinger shaft remained at Bollinger Shipyard.

The work progressed at Superior Boat Works to the stage at which it appeared Superior would be ready to install propellers and tail shafts on or about April 4, 1994. Hugh Mac was called upon to provide propellers and shafts for that purpose. There followed a series of letters between Hugh Mac and plaintiff during the months of March, April and May, 1994. Some of those letters are exhibits to the motion; one of them is an exhibit to Hugh Mac's response; and the existence of others is indicated by references in the letters with which the court has been provided. It is plain, however, that the court has not been provided with the complete correspondence between Hugh Mac and plaintiff during that period of time.

What has been provided establishes, *inter alia,* the existence of two, perhaps three, points of disagreement between plaintiff and Hugh Mac concerning the propellers and tail shafts. Those points of disagreement were (1) who was to bear the cost of transporting the propellers and shafts from New Orleans to Greenville; (2) whether or not Louisiana

Dry Dock and Bollinger Shipyard would release the propellers and/or shafts on their respective premises without payment of storage charges; and perhaps (3) whether or not the "good" tail shaft at Louisiana Dry Dock needed repair before it could be utilized on the Chris Way, and, if so, whether or not an "extra" would be authorized by Hugh Mac to accomplish such repairs. There are other points of disagreement in the correspondence as to other matters, but nowhere is there any suggestion of a disagreement between plaintiff and Hugh Mac concerning which propellers and tail shafts Hugh Mac intended to furnish for installation on the Chris Way. It is explicitly stated in letters written by officials of Hugh Mac that the two propellers and one "good" tail shaft at Louisiana Dry Dock and one tail shaft at Bollinger Shipyard were intended by Hugh Mac to be the propellers and tail shafts installed on the repowered and refurbished Chris Way MacMillan. Indeed, in a letter dated May 5, 1994 addressed to plaintiff, J. Anthony Terrell, Marine Superintendent of Hugh Mac, insisted that it was plaintiff's responsibility to pick up the propellers and tail shafts from Louisiana Dry Dock and Bollinger and to transport them to Greenville. Mr. Terrell urged that the shaft at Bollinger be picked up immediately, as it was available at any time, and also stated that the "remaining equipment" at Louisiana Dry Dock would be released soon and that he would advise plaintiff when those items "... can be picked up."

Eventually, plaintiff obtained possession of the two propellers and one "good" tail shaft stored at Louisiana Dry Dock and the tail shaft stored at Bollinger Shipyard and removed them to its Harvey, Louisiana facility where they remain. The unusable tail shaft removed from the Chris Way remains at Louisiana Dry Dock.

The correspondence between plaintiff and Hugh Mac also discussed the potential effect of Hugh Mac's pending Chapter 11 bankruptcy proceedings on the agreement to repair and repower the Chris Way MacMillan. It is clear, however, that even after the bankruptcy petition was filed work continued on the Chris Way for a time. The petition was filed February 17, 1994, and it was not until April 20, 1994 that plaintiff instructed Superior to suspend work on the Chris Way. On July 7, 1994 the bankruptcy court held that the repair and repower agreement was not assumable by the debtor under 11 U.S.C. § 365(c)(2). Notwithstanding the pendency of the bankruptcy proceedings, all parties to the repair and repower agreement—plaintiff, Hugh Mac and Superior—continued, at least into the month of May, 1994, to conduct business with regard to the Chris Way in a manner which indicated their intention and understanding that the work on the Chris Way would go forward and that the propellers and tail shafts now in the possession of plaintiff would ultimately be installed on the Chris Way.

The court must conclude from the foregoing facts that no rational trier of fact could find that the propellers and tail shafts were delivered to plaintiff for any purpose other than installation on the refurbished and repowered Chris Way MacMillan. Nor could a rational trier of fact conclude that the intentions, expectations and desires of Hugh Mac in delivering, or causing to be delivered, into the possession of plaintiff those propellers and tail shafts was anything other than that they ultimately be installed on the Chris Way MacMillan.

■ What legal consequences flow from those facts? The court holds that, as between plaintiff and Hugh Mac, from the time the two propellers and tail shafts now in the possession of plaintiff were delivered to plaintiff by Hugh Mac with the intent and purpose of incorporating them in the repaired and repowered M/V Chris Way MacMillan they became appurtenances of the vessel and thus subject to the lien of the preferred ship mortgage.

■ The court is led to that conclusion by two ancient principles of maritime law, though no case directly in point has been cited by the parties and the court's own research has revealed none. The first is that components of a vessel, even though readily removable, which are essential either for her general navigation or for the specific voyage upon which she is embarked become a part of the vessel itself and thus constitute appurtenances or apparel of the vessel. *The Hope,*

191 Fed. 243, 245 (D.Mass.1911). *See* also, *The Joseph Warner*, 32 F.Supp. 532, 533 (D.Mass.1939); *The Frolic*, 148 Fed. 921, 922 (D.R.I.1906); *The George Prescott*, 10 Fed. Cas. 222, 224, No. 5339 (E.D.N.Y.1865). This rule, as demonstrated by the cited cases, is predicated upon the principle that one extending credit to a ship has the right to assume that the entire vessel, including all of her equipment essential to her navigation or to the completion of the voyage upon which she is embarked, stands as security for the debt. This, in turn, is based upon the principle that the legitimate expectations of a maritime lienholder as to the property standing as security for the debt should be enforced. Some courts have analogized the issue with the question of when an article becomes a fixture upon real property. *The Joseph Warner, supra; The Mildred*, 43 Fed. 393, 395 (E.D.Mich.1890). Though the two principles are not entirely congruent, the analogy is a useful one if not drawn too far. In those cases great weight is placed upon the intentions of the parties, particularly the "obvious intent of the owner." *The Mildred, supra.*

█ The second governing principle is that an item of equipment need not be aboard the vessel in order to be an appurtenance of the vessel. *United States v. The Zarco*, 187 F.Supp. 371, 373 (S.D.Cal.1960); *The George Prescott, supra.*

Applying those principles to the facts of this case, although the propellers and tail shafts are not aboard the Chris Way MacMillan, they are plainly essential to her navigation and it was plainly the intention of Hugh Mac, the owner of both the Chris Way Mac-Millan and the propellers and shafts in question, in causing them to be delivered to plaintiff that they be dedicated to the Chris Way and eventually installed in her. Thus, it was the intention of Hugh Mac and the legitimate expectation of plaintiff when plaintiff received the propellers and tail shafts that they were appurtenances of the Chris Way subject to the lien of the preferred ship mortgage.

The court reaches this result without giving any weight to the fact that the two propellers and one of the tail shafts came from the Chris Way and constituted a part of her equipment prior to her sinking. Notwithstanding that history, a reasonable inference can be drawn from the evidentiary materials before the court that once the Chris Way was raised and it was initially determined that she would not be repaired, it was the intention of Hugh Mac in removing her propellers and tail shafts that they be severed from the vessel and thus were no longer appurtenant to her. Hugh Mac is entitled to the benefit of that inference on summary judgment. However, once Hugh Mac evidenced a contrary intention by delivering the propellers and one of the shafts removed from the Chris Way to plaintiff for installation on the refurbished vessel pursuant to the repair and repower agreement, they once again became appurtenant to her.

█ Hugh Mac's argument that the Bollinger shaft cannot be appurtenant to the Chris Way because it is an appurtenance of the Donald Cargill MacMillan and is therefore subject to a first preferred ship mortgage against that vessel held by another creditor is not well taken for two reasons.

First, the court is not persuaded that the Bollinger shaft, prior to its delivery to plaintiff, constituted an appurtenance of the Donald Cargill or any other vessel. Instead, it was merely a part of Hugh Mac's inventory of spare parts. It might have been used on the Donald Cargill. It might, prior to her sinking, have been used on the Chris Way. It might, indeed, have been sold to another shipowner having need of such a shaft. It had neither been installed on the Donald Cargill nor dedicated to her use. It was certainly not essential to her navigation, and may never have become so, since, for all that appears to the court, she had two serviceable tail shafts in use and could not have usefully employed a third even if it had been placed aboard. The Bollinger shaft was thus a spare part and not an appurtenance of the Donald Cargill.

█ Second, even if the Bollinger shaft could somehow constitute an appurtenance of the Donald Cargill, Hugh Mac, as plaintiff points out, has no standing to raise the issue on behalf of the holder of the preferred ship mortgage against the Donald Cargill. If that

issue were raised by way of a claim to the Bollinger shaft filed on behalf of another creditor, the court might have to consider the argument more seriously, although the excerpts from that mortgage attached to Hugh Mac's response to the motion do not purport to extend its lien to Hugh Mac's inventory of spare parts, nor to all assets of the company. In any event, the possible claim of a third party is of no moment in this dispute between plaintiff and Hugh Mac.

### (b) *Old Engines*

■ Application of the basic principles discussed in subpart (a), *supra,* to the engines removed from the Chris Way by plaintiff (the old engines) yields a different result.

Plaintiff's Motion for Partial Summary Judgment and for Interlocutory Sale seeks partial summary judgment "... declaring the M/V CHRIS WAY MACMILLAN, its *engines,* tackle, apparel ... liable for whatever amounts are deemed due and owing to S & S. ..." (Motion, unnumbered p. 1) (Emphasis supplied). The motion further seeks an interlocutory sale of the Chris Way, similarly described, including her "engines." In opposition to the motion Hugh Mac argues that the old engines are no longer appurtenances of the Chris Way and are therefore not subject to sale under the mortgage because the agreement to repair and repower the Chris Way provides otherwise. The court agrees with Hugh Mac on this issue.

The agreement contains the following provision concerning the old engines.

> "4) CONTRACTOR will give OWNER a credit of $60,000.00 on the fixed price amount as provided for in Article III(1) herein above for the old main engines which are to be removed from the VESSEL and retained by CONTRACTOR." Repower Agreement, pp. 4–5.

The fixed price provided for in Article III(1) is the fixed price of $2,698,622.00 for all of the specified work on the Chris Way.

Item 25 of the specifications incorporated in the agreement is entitled "Main Engine & Gears." It provides for the removal of the old engines, as well as other items of equipment, at least some of which was to be repaired and reinstalled in the Chris Way. As to the engines themselves, Item 25 provides "[u]nbolt foundation bolts and remove engines to shop. Shift vessel and position in yard for removals. Provide crane service for engine removals." However, the specifications call for no repair of the old engines. Instead, they provide as follows.

> "Furnish replacement EMD mod 16–710G series engines and install. Drill forward foundation hold down bolts and position engine. Install replacement air start manifolds. Ballast vessel to approximately half operating trim. Align engines to shaft line." Specifications, p. 7.

In addition, an addendum to the specifications sets out a detailed description of the new engines to be supplied by plaintiff and quotes a price, f/o/b shipyard, of $1,002,-000.00 for the new engines. That price is included in the overall fixed contract price of $2,698,622.00.

After the November 3, 1993 agreement was executed plaintiff began the work therein called for. Pursuant to the agreement it removed the old engines from the Chris Way and placed them on its Harvey, Louisiana yard where they remain.

■ Plaintiff contends, notwithstanding the clear and unambiguous provisions of the agreement, that because the Chapter 11 bankruptcy of Hugh Mac prevented Hugh Mac from performing its obligations under the agreement, the new engines contemplated by that agreement were never sold to Hugh Mac nor installed in the Chris Way, and Hugh Mac is therefore not entitled to the $60,000.00 credit for the old engines. Plaintiff cites no authority to support that position, and the court must reject it.

Plaintiff's argument that the old engines once again became appurtenances of the Chris Way because of Hugh Mac's default is contrary to the plain and unambiguous terms of the agreement. The agreement provides that plaintiff is to remove the old engines from the Chris Way and that, once removed, they become the property of plaintiff in consideration of a $60,000.00 credit against the fixed contract price for the repair and repower of the Chris Way. Most significantly, it

does not provide that there is to be a $60,-000.00 credit against merely the $1,002,000.00 price of the new engines, but against the entire fixed contract price of $2,698,622.00. It is also not made conditional upon the sale and installation of the new engines.

The parties plainly contemplated the possibility of a default because Article XIV of the agreement sets out detailed provisions for that eventuality. It says nothing about a withdrawal or revocation of the $60,000.00 credit for the old engines in the event of a default by Hugh Mac, and it also fails to provide for a divestiture of plaintiff's title to the old engines in the event of default. The clear intention of the parties, as evidenced by the words of their agreement, was that the old engines, once they were removed from the Chris Way by plaintiff, would belong to plaintiff to be dealt with as plaintiff saw fit, and that in return Hugh Mac would receive a credit of $60,000.00 against the fixed contract price. That portion of the agreement has been fully executed.

Giving effect to the intentions and legitimate expectations of the parties, as evidenced by their agreement and subsequent conduct, the old engines, once they were removed from the Chris Way, were no longer appurtenant thereto. Instead, they became and remain the separate property of plaintiff. Accordingly, the motion will be denied insofar as it seeks a sale of the old engines as appurtenances of the Chris Way MacMillan.[5]

### VI. *Interlocutory Sale*

Plaintiff seeks interlocutory sale of the vessel and its appurtenances under Supplemental Admiralty Rule E(9)(b) on the grounds that the vessel is deteriorating and the expense of keeping her under arrest is excessive.

Hugh Mac neither disputes those contentions of the plaintiff nor objects to the sale of the hull, but contends that the equipment at issue, *i.e.* the propellers, tail shafts and old engines should not be sold, or, if sold, should be sold separately and any funds derived therefrom deposited in the registry of the court pending a determination of whether or not they are subject to the mortgage.

■ Supplemental Admiralty Rule E(9)(b) provides:

> "If property that has been attached or arrested is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expense of keeping the property is excessive or disproportionate, or if there is unreasonable delay in securing the release of property, the court, on application of any party or of the marshal, or the person or organization having the warrant, may order the property or any portion thereof to be sold; and the proceeds, or so much thereof as shall be adequate to satisfy any judgment, may be ordered brought into court to abide the event of the action; or the court may, upon motion of the defendant or claimant, order delivery of the property to the defendant or claimant, upon the giving of security in accordance with these rules."

Although plaintiff has not provided evidence that the Chris Way is deteriorating, it has shown the expense incurred in maintaining the vessel in custody to be $150.00 a day plus the cost of insurance (Exhibit H to motion).

■ This expense is enough to convince the court that it is in the interests of all parties that the M/V Chris Way MacMillan be sold at interlocutory sale, since the expense of keeping the property is clearly disproportionate to its value. Though the court today holds that the propellers and tail shafts in question are appurtenances of the vessel and are therefore subject to sale under the mortgage, in order to preserve the rights of the parties in the event of an appeal, the court will order that the propellers and tail shafts be sold separately from the rest of the vessel and that the proceeds of the sale of the propellers and shafts be deposited in the

---

**5.** The court recognizes that the principles upon which it relies to reach this result, as well as the result reached in subpart (a), *supra,* could also lead to a holding that the new engines contemplated by the agreement, if they are in the possession of plaintiff, are appurtenances of the Chris Way. However, the court need not decide that point because no party advocates such a result, and, even if that were not so, the court has not been provided with admissible evidence concerning the status of the "new" engines.

registry of the court and there remain pending further order of the court.

Plaintiff asserts that the cost of transporting the propellers and tail shafts from its Harvey, Louisiana facility to Superior Boat Works in Greenville where the hull is located would be $10,000.00 to $15,000.00 (Exhibit H to the motion). Thus, plaintiff requests that the propellers and shafts be sold as part of the vessel, but that the court not require that they be transported to Greenville. All parties are in agreement that the bids for the Chris Way are not likely to be affected by the fact that the propellers and tail shafts are at Harvey while the hull of the vessel is at Greenville, and no party desires that the propellers and shafts be moved prior to a sale. The court will therefore not require that the propellers and shafts be moved to Greenville. However, it is still necessary that the court obtain jurisdiction over them.

Ancillary process for appurtenances is available where a major portion of the res is within the control of the court. *State of Florida v. Treasure Salvors*, 621 F.2d 1340, 1347 (5th Cir.1980). Supplemental Admiralty Rule C(5) provides for ancillary process for property that is a subject of the action, but which has not been brought within the control of the court. The court in *Treasure Salvors* held that Admiralty Rule E(3) (which limits service of process in rem to the geographical limits of the district) does not govern ancillary process, since such process does not require the seizure of property. *Id.* at 1348. Instead the court held Rule 4(f), Federal Rules of Civil Procedure, to be applicable since it provided the general rule establishing the territorial limits of process. It therefore allowed ancillary process for artifacts salvaged from a ship which were located in a Florida district other than the district where the action was pending. *Id.* at 1346, 1348. At that time Rule 4(f) provided for service of process anywhere within the state in which the district court sits. Rule 4(f), as amended effective December 1, 1993 and redesignated as Rule 4(k), extends the territorial limits of service of process nationwide.

Thus, the court holds that it has the power to issue ancillary process for the propellers and shafts located in Louisiana and to direct that such process be served in that state. Since it is the plaintiff who has possession of the propellers and shafts and desires their sale as appurtenances of the Chris Way MacMillan, the plaintiff may avoid the expense and delay of issuance and service of formal process by voluntarily submitting them to the jurisdiction of this court and tendering them into the constructive possession of the United States Marshal for the Northern District of Mississippi. Upon the service of ancillary process or the voluntary submission by plaintiff of the propellers and shafts to the jurisdiction of this court, and after the necessary arrangements have been made for a consent keeper and the insurance coverage required by the marshal, the propellers and tail shafts delivered by Hugh Mac into the possession of plaintiff for installation in the M/V Chris Way MacMillan shall be deemed to be in the constructive possession of the United States Marshal for the Northern District of Mississippi and subject to sale as appurtenances of the Chris Way MacMillan.

Plaintiff shall prepare and submit to the court and the other parties a proposed order for the interlocutory sale of the Chris Way MacMillan specifying, *inter alia,* the date and terms of the sale, as well as the form and manner of publication of notice.