Julia **GONZALEZ** as personal representative of the Estate of Narciso Alvarez Tercero and as wife of the decedent et al. Plaintiff

v.

**M/V DESTINY PANAMA, etc., in rem, Export Terminal, Inc., and Unofort Investments, Ltd., in personam Defendants**

No. 00–1690.

United States District Court, S.D. Florida, Miami Division.

June 28, 2000.

John H. Hickey, Hickey & Jones, Miami, FL, for Plaintiff.

Jan M. Kuylenstierna, Fowler White Burnette Hurley Banick & Strickroot, Miami, FL, for defendant.

## ORDER GRANTING EMERGENCY MOTION TO SET BOND

JORDAN, District Judge.

The defendant vessel, the *M/V Destiny Panama*, "together with her boats, tackle, apparel, furniture, engines, and appurtenances," was arrested on May 18, 2000, to secure the plaintiffs' wrongful death claim. Warrant for Arrest *In Rem* [D.E. 10] (May 18, 2000). *See also* Amended Complaint [D.E. 8] (May 17, 2000); Amended Emergency Motion for Arrest [D.E. 9] (May 17, 2000); Order Directing Issuance of Warrant of Arrest [D.E. 12] (May 18, 2000). Unofort Investments, Ltd., the owner of the *Destiny Panama*, moved on an emergency basis to set a bond amount so that it could obtain the *Destiny Panama*'s release from custody. *See* Emergency Motion to Set Bond and for Release of Vessel [D.E. 17] (June 1, 2000). That motion was deferred to allow the parties to address whether the *Destiny Panama*'s replacement engines were within the reach of the warrant for arrest and to present evidence regarding the value of those engines. *See* Order Granting Motion for Discovery [D.E. 29] (June 8, 2000). The parties have since filed supplemental memoranda on these matters.

### Undisputed Facts

During the hearing on the motion to set bond, the parties agreed that the *Destiny Panama* without regard to her replace-

ment engines is worth about $190,000. *See* Notice of Filing Updated Survey [D.E. 24] (June 6, 2000). The parties now also agree that Unofort purchased two replacement engines for the *Destiny Panama* in April of 2000 for $80,000. These replacement engines have been stored at Export Terminal's yard on the Miami River within this judicial district since May 15, 2000, three days before the warrant for arrest issued. The ship's old engines do not function but remain installed. *See* Claimant/Owner's Memorandum of Law on Appurtenances [D.E. 35] at 2, 4 (June 20, 2000); Plaintiffs' Supplemental Memorandum in Response to Order [D.E. 34] at 2 & Exhibit A (June 20, 2000).

## Arguments

Unofort insists, relying on *Nelson v. The Arctic*, 1956 A.M.C. 502 (W.D.Wash.1956), that the replacement engines are not appurtenances because they were never installed on the *Destiny Panama*. *See* Claimant/Owner's Memorandum at 5–6. Citing no authority, the plaintiffs assume that common ownership of the engines is conclusive evidence that they are appurtenant to the ship. *See* Plaintiffs' Memorandum at 2. On the facts, Unofort argues that, even if the replacement engines are appurtenances, the maximum bond should be $230,000—$190,000 for the *Destiny Panama* herself plus $80,000 for her replacement engines less the $40,000 value of her current engines. *See* Claimant/Owner's Memorandum at 9–10. The plaintiffs argue that bond should be set at $460,-000—their estimated value of the *Destiny Panama* with her replacement engines installed and operational. *See* Plaintiffs' Memorandum at 3. The plaintiffs cite no authority in support of this conclusion.

## Legal Analysis

The analysis begins with what constitutes a ship or a vessel. "A ship is considered as consisting of the hull and engines, tackle, apparel, and furniture of all kinds. This, of course, is elemental and requires no citation of authority." *The Augusta*, 15 F.2d 727, 727 (E.D.La.1920) (citing Benedict on Admiralty ¶ 157). In other words, "[t]he term 'vessel' includes its apparel and appurtenances." T.A. Russell, 2 Benedict on Admiralty § 32 at 3–3 (1999). An appurtenance is commonly defined as an item that is essential to the ship's navigation, operation, or mission. *See Stewart & Stevenson Servs., Inc. v. M/V Chris Way MacMillan*, 890 F.Supp. 552, 561–62 (N.D.Miss.1995); *Payne v. SS Tropic Breeze*, 274 F.Supp. 324, 330 (D.P.R.1967), *rev'd on other grounds*, 412 F.2d 707 (1st Cir.1969); *United States v. F/V Sylvester F. Whalen*, 217 F.Supp. 916, 917 (D.Maine 1963); *The Witch Queen*, 30 F.Cas. 396, 397 (D.Calif.1874).

Some of these authorities could be fairly read to indicate that a ship's engines are as much a constituent part of the ship *qua* ship as the hull and are not, therefore, appurtenances: "[I]f, indeed, they were, they would not be appurtenances, for the very nature of an appurtenance is that it is one thing which belongs to another thing ...." *The Edwin Post*, 11 F. 602, 605 (D.Del.1882) (quoting *The Dundee*, 1 Haggard 109 (1823) (Stowell, L.)). This semantical question of whether engines are properly termed constituent parts of or appurtenances to a vessel need not be resolved because the plaintiffs' maritime lien would attach either way. Under these particular facts, it is more likely that the replacement engines are related to the *Destiny Panama* as appurtenances as opposed to constituent parts of the ship because they have never been installed or used on the *Destiny Panama* and therefore at present constitute no part of her. Therefore, the question facing the parties and the Court is whether the new engines, though not yet installed, are appurtenant to the ship.

It is well-established that an appurtenance need not be installed or on board a vessel at the time of her arrest to be itself subject to the warrant for arrest. The seminal case on point was decided by Judge Augustus Hand. In 1924, the steamship *Great Canton* was sold at auction by the United States Marshal for the South-

ern District of New York. The purchaser subsequently discovered that the ship's chronometer had been removed prior to the sale for repairs. Judge Hand held that the chronometer was nonetheless an appurtenance of the ship: "While the chronometer was not on board the *Great Canton* when the marshal made his seizure and was never in his physical possession, that fact should not defeat the purchaser's right." *The Great Canton*, 1924 A.M.C. 1074, 1075 (S.D.N.Y.1924). Judge Hand relied on the fact that pursuant to Admiralty Rule 9, then in effect, the marshal could have seized the chronometer from the place where it was being repaired. Rule 9 provided as follows:

> In all suits *in rem* against a ship, and/or her appurtenances if her appurtenances or any of them are in the possession or custody of any third person, the court shall, on due notice to such third person and after a hearing, decree that the same be delivered into the custody of the marshal or other proper officer, if on hearing it appears that the same is required by law and justice.

*Id.*

Accordingly, the court deciding *The Arctic* held that electronic equipment that was removed from a fishing vessel and stored in her owner's basement prior to the vessel's arrest and sale was nonetheless appurtenant to the vessel. The court stated that "[e]quipment that is useful in the operation of a vessel becomes an appurtenance when installed." 1956 A.M.C. at 502. Thus, installation will in many cases, like in *The Arctic*, be sufficient to establish that the item in question is an appurtenance. It does not follow, however, that installation is a necessary pre-condition to a finding that a given item is appurtenant to a vessel. Indeed, contrary to Unofort's suggestion, an item may be an appurtenance even though it has never been installed on the vessel to which it belongs.

In *Stewart & Stevenson Services*, the court held that a tail shaft that had never been installed on the boat for which it destined was nonetheless its appurtenance.

The controversy was rooted in the sinking of the tugboat *Chris Way MacMillan* at the Louisiana Dry Dock in New Orleans. Her owner, Hugh Mac Towing Corporation, decided not to attempt to refit her and removed her propellers and tail shafts. Hugh Mac owned another towboat that utilized identical propellers and tail shafts. At the time of the sinking of the *Chris Way*, Hugh Mac's inventory included one other propeller and one other tail shaft identical to the two salvaged from the *Chris Way*. Some months after the sinking, Hugh Mac reconsidered its decision to refit and refurbish the *Chris Way*. Work began in late 1993 or early 1994 and continued after Hugh Mac filed for bankruptcy in February of 1994. Hugh Mac was to supply the propellers and tail shafts for the refit and ultimately determined to use both propellers and one of the two tail shafts removed from the *Chris Way* after her sinking. Because the other salvaged tail shaft was damaged, Hugh Mac decided to use its third identical tail shaft for the refit. These parts were eventually transported to and grouped at a particular shipyard.

The plaintiff in the case, Stewart & Stevenson Services, Inc., was the general contractor performing the refit and the mortgagee for the value of the work. It brought suit to foreclose its mortgage. One of the issues before the court was whether the propellers and the tail shafts were appurtenances of the *Chris Way* at the time she was arrested by the court. The court held that, despite the fact that the items were not on board the vessel at the time of arrest, they were appurtenances because they were necessary for her general navigation. *See* 890 F.Supp. at 561–62. The court's reasoning was grounded in the undisputed fact that the particular parts in question were destined to be installed on the *Chris Way*: "[N]owhere is there any suggestion of a disagreement between plaintiff and Hugh Mac concerning which propellers and tail shafts Hugh Mac intended to furnish for installation on the *Chris Way*." *Id.* at 561. The fact that

the propellers and one of the tail shafts had previously been installed on the *Chris Way* played no part in the decision: "The court reaches this result without giving any weight to the fact that the two propellers and one of the tail shafts came from the *Chris Way* and constituted a part of her equipment prior to her sinking." *Id.* at 562. On this reasoning, Unofort's argument that uninstalled engines can never be appurtenances simply because they are uninstalled is incorrect. *See also* 2 Benedict on Admiralty § 32 at 3–4–3–5 & n.7 (stating that the parties' intent bears on question of whether a given item is an appurtenance).

The plaintiffs' argument—that the common ownership of the *Destiny Panama* and her replacement engines is dispositive—is likewise without merit. Obviously, not everything that the owner of a ship owns is subject to a warrant for arrest of that ship. Conversely, an item may be appurtenant to a vessel even though the vessel and the item are not under common ownership. The reasoning underlying the arrest of a vessel in the first instance is the fiction that the vessel is herself responsible for the wrong committed, and ownership of the vessel and her appurtenances is beside the point:

> "The offending ship is considered as herself the wrongdoer, and is herself bound to make compensation for the wrong done. The owner of the injured vessel is entitled to proceed in rem against the offender, without regard to the question who may be her owners, or to the division, the nature or the extent of their interests in her. With the relations of the owners of those interests, as among themselves, the owner of the injured vessel has no concern. All the interests, existing at the time of the collision, in the offending vessel, whether by way of part ownership, of mortgage, of bottomry bond or of other maritime lien for repairs or supplies, arising out of contract with the owners or agents of the vessel, are parts of the vessel herself, and as such are bound by and responsible for her wrongful acts."

*Turner v. United States,* 27 F.2d 134, 136 (2d Cir.1928) (quoting *The John G. Stevens,* 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969 (1898)).

Thus, in *The Augusta,* the court held that radio equipment leased from the Radio Corporation of America could be used to satisfy maritime liens against the vessel if the proceeds of the ship were insufficient. 15 F.2d at 728. The court reasoned that "the wireless, being on the ship, formed part of her equipment, regardless of who the actual owner might be." *Id.* at 727. Following that decision and others, the court in *F/V Sylvester F. Whalen* concluded that radar equipment and a fathometer installed on board a fishing vessel were appurtenances subject to a maritime lien on the vessel even though the owner of the vessel had leased the equipment from a third party. *See* 217 F.Supp. at 916–917. *See also United States v. F/V Golden Dawn,* 222 F.Supp. 186, 188 (E.D.N.Y.1963) (holding that preferred maritime liens "tend toward reaching every sort of interest in the congeries of vessel, tackle, apparel and furniture that has been committed to the hazard of the vessel's voyages and enterprise without regard to ownership and sub-divisions of ownership interests" but that mortgages extend only to what mortgagor owns); *The Frolic,* 148 F. 921, 923–24 (D.R.I.1906) ("[T]he question of title becomes immaterial if [the innocent owners] have in fact consented to its use as an appurtenance of the vessel.").

■■ A general rule for determining whether a particular item is an appurtenance can be synthesized from the reasoning set forth in the foregoing cases. Neither installation, location, nor ownership is dispositive of the matter. Rather, an appurtenance is any specifically identifiable item that is destined for use aboard a specifically identifiable vessel and is essential to the vessel's navigation, operation, or mission. Thus, the chronometer temporarily removed from the *Great Canton* for repairs was appurtenant to her although not on board at the time of arrest. The wireless equipment on board *The Augusta*

was appurtenant to her because, although owned by RCA, the equipment was in use on the vessel and was necessary to her mission. The two propellers and two tail shafts that Hugh Mac set aside for installation aboard the *Chris Way* were appurtenant to her although not installed and although one tail shaft had never been installed. All of these various pieces of equipment or components were specifically intended to be used on board these particular vessels and no others at the time the vessels were arrested. None of these items was one of a number of interchangeable items that were available to be substituted: the *Great Canton* had one chronometer, RCA leased only one wireless unit for use on board *The Augusta,* and Hugh Mac sent two particular propellers and two particular tail shafts to be installed on the *Chris Way.* Likewise, Unofort purchased two particular engines and brought them to Miami to be installed on the *Destiny Panama.* They are therefore appurtenant to her.

■ There remains only the issue of the parties' suggested mathematical computations. The plaintiffs' contention that the bond for the *Destiny Panama* should be set as though the replacement engines were installed and operational is without merit. The evidence in the record leaves no question that it would require a significant investment of resources to overhaul and install the replacement engines. Bond is to be set at the sum of the fair market value of the vessel and her appurtenances at the time of arrest, not at a speculative value based on repairs or upgrades that may or may not be made at some time in the future.

■ Unofort's suggestion that the value of the old engines should be deducted from the bond amount is also unsound. Unofort apparently means to imply that only one set of engines can be appurtenant to or part of the *Destiny Panama* at any one time. There is no support for this contention and it simply does not logically follow. At the time of arrest, there were installed on board the *Destiny Panama*

two non-functional engines. On land, there were two replacement engines destined to be overhauled and installed. The residual value of the original engines would presumably offset this process of overhaul and installation. The fact that, at the time of arrest, this residual value had not been liquidated and devoted to refitting the *Destiny Panama* does not mean that the plaintiffs' claim does not attach to the engines' residual value. The original engines, though broken, remained a constituent part of the *Destiny Panama*—as surely as the broken chronometer in *The Great Canton* was part of that vessel—and the replacement engines were simultaneously appurtenances. Bond is therefore set at the sum of the *Destiny Panama,* which the parties agree is about $190,000, plus the value of the engines intended for her, which the Court finds is $80,000.

### Conclusion and Relief

Unofort's motion to set bond [D.E. 17] is GRANTED. Bond is set at $270,000. Upon satisfaction of the bond and any attendant fees owed to the United States Marshal or other third parties, the *Destiny Panama* shall be released.